|, CARAWAY, J.
This case involves a tragic one vehicle accident in which a fifteen-year-old driver of a pickup was injured and his father, a passenger, was killed'. The plaintiffs instituted this action against the vehicle’s manufacturer and a local dealer claiming that a leak in the exhaust system caused carbon monoxide (“CO”) to infiltrate the truck’s cab, incapacitating both occupants. Finding the jury’s verdict in favor of the defense tainted by an evidentiary ruling, we have reviewed the evidence de novo and affirm the trial court’s ruling upon our determination that CO poisoning was insufficiently established as the cause of the accident.

Facts

In July 1989, Cecil Masters (“Cecil”) purchased a new 1989 Ford F-250 pickup truck from Courtesy Ford, Inc. (“Courtesy”). The truck was primarily used by Cecil and his fifteen-year-old son, Eric (“Eric”), in Cecil’s contracting business. Eric, who obtained his driver’s license on October 9, 1989, had only driven the truck without an adult present on two occasions prior to the accident.
On November 21, 1989, Cecil took the truck back to Courtesy and advised the dealer of certain problems with the truck which, with 11,623 miles, was still under warranty. Cecil complained that he heard a “clicking” noise and that there was a “groaning” in the engine. Cecil also told the service manager at Courtesy that the truck occasionally blew black smoke from the tailpipe. One Courtesy service order for that date reflected the work of mechanic, Larry Fuller, who reviewed the “groaning” noise in the engine. Fuller registered a notation, “NPF,” no problem found. However, a second service order also dated November 21, 1989 contained the language “check for exhaust leak, engine clicking” “front grill loose,” and “blows black smoke sometimes” (hereinafter, the “Service Order”). The complaints of “front grill loose” and “blows black smoke sometimes” both 12had the notation “NPF.” Beside the complaint of “check for exhaust leak, engine clicking” was a notation “SOP,” specially ordered part. The back of the Service Order indicated that Courtesy had ordered an EGR tube to the exhaust manifold.
The EGR tube is the passageway allowing exhaust gases from the exhaust manifold to re-circulate back up to the EGR valve located at the top of the engine. The EGR valve regulates the flow of a small portion of the engine’s exhaust back into the engine’s combustion chamber for cooling. When the temperature of the combustion chamber gets too high, nitrous oxide is emitted which is one of the exhaust gas components controlled by the federal government. A cooling is accomplished by allowing a very limited amount of exhaust gas to flow out of the manifold, up through the EGR tube to the bottom of the EGR valve and into the combustion chamber.
The mechanic who had examined the exhaust system and ordered the EGR tube was Randy Rainwater (“Rainwater”). At the time of trial, and previously in pretrial discovery, Rainwater’s whereabouts were unknown so that plaintiffs’ ability to present evidence regarding Rainwater’s inspection of the truck was limited. Because the EGR tube had to be ordered, the truck was not repaired on November 21 and the vehicle was returned to Cecil.
There was little dispute concerning the facts of the accident which occurred on December 4, 1989. On that morning, Cecil and Eric left their house in West Monroe at approximately 7:00 a.m. in the truck. The morning was cold and they traveled with the windows up and the heater on. They made several stops in the Monroe area and Eric remained in the truck with the engine running for extended periods during the morning. En route to a job site in Farmerville, Cecil and Eric stopped for gas in West Monroe about 10:00 a.m., and they left the gas station eating candy bars and drinking Cokes. At this point, Cecil asked Eric to drive so |sthat he could *177 do some calculations in connection with a job. Neither Cecil nor Eric was wearing a seat belt.
The drive from West Monroe to Farm-erville is approximately 30 miles, and the accident occurred near Rocky Branch, approximately halfway to Farmerville. After leaving the gas station, Eric remembers Cecil completing his figuring and picking up the paper to work on the crossword puzzle. Eric has no recollection of anything after that until he woke up in the hospital.
Lin Kesee, a truck driver, traveled behind the Masters’ truck for the final seven to eight miles until he witnessed the accident’s occurrence just outside Rocky Branch. He first approached the vehicle at the D’Arbonne Bayou bridge not too far from West Monroe. Throughout the eight-mile stretch while Kesee followed the Masters’ truck, he only noticed one person in the truck, the driver.
Passing through Rocky Branch, the Masters’ truck encountered other traffic and all proceeded through the small rural community at 45 m.p.h. Leaving Rocky Branch, the other traffic sped back up while Eric maintained a slower speed. The accident then occurred while the trucks ascended a steep hill. Although there were no other cars in front of the truck, Eric crossed the double yellow line drifting over into the left-hand lane on the two-lane highway. The truck traveled approximately 50 yards in the left-hand lane maintaining a 45 m.p.h. speed. Turning suddenly to the left, it then went off the pavement, down an embankment striking a large tree. Kesee never saw the driver apply the brakes or make any evasive actions to avoid the accident.
Both Eric and Cecil were unconscious when witnesses first reached them but both started to come to within four or five minutes. Cecil, who only exhibited slight movement and groans, died before medical help could arrive. The force of the impact had pushed the steering wheel and column into the driver’s seat. Eric, |4who was lodged between the driver’s side door and the crushed steering wheel, suffered numerous orthopedic injuries in the accident.
Terry Sue Anding, a registered nurse, passed by the scene shortly after the accident occurred. She went down to the vehicle and aided Eric while he remained pinned in the truck. Anding checked on Cecil but he did not have a pulse and was not breathing. She noticed that Cecil’s blood appeared to be unusual, describing it as “bright red.” Anding compared Cecil’s blood to extra-oxygenated blood that she had observed in caring for infants while on oxygen.
Louisiana State Police Trooper Jim Stephens was notified of the accident at 10:56 a.m. When he arrived at the scene, the ambulance personnel were already there. The road where the accident happened is a straight uphill stretch of highway. Trooper Stephens measured the distance at 99 feet, 9 inches from where the truck left the highway until it collided with the pine tree. The tree itself was only 24 feet, 5 inches from the roadway. With very little shoulder, upon leaving the road, the truck immediately went down a rather steep embankment. Trooper Stephens found no evidence of anything that would have caused the truck to leave the highway, no skid marks or any indication that the brakes of the truck were applied prior to the impact and no evidence that the driver attempted to get back onto the highway.
Over a month after the accident, Judy Masters (“Judy”) received a call from Courtesy advising her that the part which had been ordered for her husband’s truck was at the dealership. Judy went to Courtesy and picked up the part, an EGR tube.
Upon this discovery of the ordered part, the wrecked truck was inspected by a mechanic, Donnie Tuminello, in March 1990. Tuminello found that there was a break or separation between the base of the EGR valve and the EGR tube. A fitting on the EGR tube allowed the tube to be screwed into the EGR valve, and 1 ¡¡the defective *178 valve, in the opinion of plaintiffs’ experts, prevented a proper connection between the two parts allowing for an exhaust leak. Tuminello did not examine the truck again until September 1994 at which time he also discovered a broken thermostat and a clogged oxygen sensor. These two defective parts according the plaintiffs’ experts .may have caused the truck to burn an excessive fuel mixture which would raise the level of CO in the engine’s exhaust.
There was evidence that Cecil and Eric had experienced a few headaches and lethargy during the fall of 1989, including testimony that Cecil had complained of a headache on the morning of the accident. However, there was also information that they had been working fairly hard that autumn and that Cecil had prior sinus problems. Eric could not recall having any headache, nausea, lightheadedness or dizziness on the day of the accident and stated that Cecil had not complained to him of any physical ailments.
Judy, Eric and Ashley, Cecil’s daughter, filed a wrongful death action and a personal injury claim for Eric’s injuries in April 1990, naming Courtesy as a defendant. Ford Motor Company (“Ford”) was later added as a defendant. The matter went to trial before a jury in December 1994. The plaintiffs’ primary claim was that CO had overcome both Cecil and Eric, causing the accident. The defendants disputed this contention arguing that sleepiness or inadvertence caused the accident.
Numerous expert witnésses testified for both sides. Both the plaintiffs’ and defendants’ accident reconstructionists agreed that it was approximately 1.8 seconds from the time Cecil’s truck left the highway until it hit the tree and that the truck was traveling at approximately 86 m.p.h. at the point of impact. The experts disagreed over whether the angle at which the truck collided with the tree indicated that Eric had sufficient time and awareness to perform a steering input prior to the | ^accident. Plaintiffs and defendants both had expert engineers who monitored the level of CO in exemplar vehicles under various conditions. Both experts concurred that while completely disconnecting the EGR tube from the EGR valve led to slightly increased levels of CO in the cab of the truck, the levels were insignificant. Only when such exhaust leak was coupled with a rich running engine was there any appreciable level of CO recorded in the cab.
No medical evidence demonstrated the presence of CO in Eric or Cecil. Although a carboxyhemoglobin test was performed on Eric to detect the level of CO, all the experts agreed that the negative results were not significant because the test was performed at least 24 hours after the accident and Eric had been administered oxygen and blood during the interim time. The level of CO in Cecil’s blood was fixed at the time of his death. However, it was not until 1993 that Cecil’s body was exhumed and an autopsy was performed by an expert for the plaintiffs, Dr. George McCormick. By that time, the body was too decomposed to determine anything definitive about the presence of CO. Dr. McCormick did opine that the injuries he observed on Cecil should not have been fatal by themselves. Nevertheless, the defendants’ expert disagreed citing potential incompleteness in Dr. McCormick’s autopsy in not finding the basilar skull fracture cited in the original coroner’s report and noting other evidence indicating that Cecil’s chest injuries could have resulted in death.
Following the lengthy trial, the jury rendered a verdict for the defendants. In response to the initial interrogatory, the jury found that plaintiffs failed to prove more probably than not that CO was the proximate cause of Cecil’s death and Eric’s injuries. The trial court entered judgment in accordance with this verdict on February 17,1995.
[7Plaintiffs filed several post-trial motions including a motion for a new trial. The motion for a new trial asserted juror *179 misconduct and attempted to present new evidence in the form of an affidavit of Rainwater, who was allegedly located by plaintiffs after the trial. Prior to a hearing on plaintiffs’ motions, plaintiffs filed a writ application with this court asserting that the trial court erred in failing to order Courtesy to produce a statement by Rainwater taken by an insurance adjuster in 1990. This court granted the writ in part ordering that Rainwater’s statement be produced for in camera inspection prior to the setting of a hearing date on the motion for new trial so that the trial court could determine whether the statement was discoverable by the plaintiffs. This court specified that if the trial court ruled the statement not discoverable, a copy of the statement be placed in a sealed file in the suit record. After considering the Rainwater statement and other matters in connection with the motion for new trial, the trial court denied plaintiffs’ motion on December 30, 1996 with written reasons but without conducting a hearing.
Through three assignments of error, plaintiffs urge reversal of the jury’s verdict because of alleged prejudicial error in the trial court’s rulings regarding evidence in the case. Plaintiffs also assert the trial court erred in its ruling on the motion for new trial. Finally, even despite the alleged errors regarding the evidence, plaintiffs assert that the jury manifestly erred in its ruling on causation of the accident.

Discussion

I.
While plaintiffs assign as prejudicial error various rulings by the trial court on evidence, the most significant ruling concerns the evidentiary exclusion of the recorded written statement of Randy Rainwater. Courtesy’s November 21,1989 Service Order reflects that Rainwater had checked the exhaust on Cecil’s truck for lathe reported clicking noise and had specially ordered a part, the EGR tube. While the Service Order was introduced into evidence by the plaintiffs, Rainwater’s explanation of what he had found during his inspection and why he had ordered the EGR tube was not obtained by plaintiffs in discovery nor available as evidence at trial due to lack of knowledge of Rainwater’s whereabouts.
On May 3, 1990, approximately two weeks after Courtesy had been served with plaintiffs’ suit, Rainwater was first made aware of the accident and was questioned by an insurance adjuster investigating the plaintiffs’ claims. Rainwater’s May 3, 1990 recorded statement to the adjuster (hereinafter, the “Rainwater Statement”), which was eventually filed under seal in the record, has been claimed by Courtesy throughout the proceedings as its privileged work product.
The history of plaintiffs’ discovery efforts leading up to the trial court ruling on the Rainwater Statement is important for a resolution of this dispute. In June 1993, Courtesy provided plaintiffs with its answers to a set of interrogatories regarding Courtesy’s maintenance work on Cecil’s truck. Through interrogatories numbers 9 and 10, Courtesy was asked to identify the details for each occurrence of maintenance work on the vehicle. The November 21 maintenance work was vaguely described through Courtesy’s answers as follows:
“Date unknown;” “Work order says right side of bed higher than left and groaning noise in engine at steady speed;” and for the identity of the mechanic, “Unknown.”
This answer reports details of a second November 21 work order by which the work of another mechanic was recorded. The additional information on the critical November 21 Service Order revealing Rainwater’s work on the vehicle was not addressed in Courtesy’s answer.[1] Instead, *180 in response to interrogatory number 11 1 ^concerning Courtesy’s ordering of parts for Cecil’s truck, Courtesy revealed that on November 24, 1989, Rainwater, whose address was reported as “unknown,” had ordered an “EGR valve.” In that interrogatory, subpart b, the plaintiffs asked why the part was ordered, to which Courtesy responded as follows:
“The parts [sic] were ordered because the build up of carbon deposits results in poor engine performance.”
The final significant inquiry in plaintiffs’ interrogatories numbers 28 and 29 requested information from all statements taken by Courtesy from persons with knowledge of the alleged problems with Cecil’s truck. Courtesy responded that “statements were taken from Courtesy Ford employees which are privileged,” citing the work product privilege. Although the identification of each employee who gave a statement was not revealed in this answer, Courtesy ultimately argued to the trial court that this answer had revealed to the plaintiffs in 1993 the existence of the 1990 Rainwater Statement, which it claims as privileged.
The issue of the work product privilege over the Rainwater Statement was not disputed by the plaintiffs until December 16, 1994, three days after the trial had commenced. At that time, plaintiffs attempted to subpoena from Courtesy the Rainwater Statement, the existence of which had only been divulged to the plaintiffs after the beginning of the trial. Plaintiffs argued to the court that in the course of discovery Courtesy had represented that it did not know what Rainwater would say concerning his inspection of the vehicle. Both parties acknowledged to the court that they had unsuccessfully attempted through investigators to locate Rainwater who was unavailable. In its defense against the production of the statement, Courtesy asserted that the statement had been taken by the adjuster in preparation for trial and was therefore work product. Courtesy’s counsel also read |into the court Courtesy’s 1993 answer to interrogatory number 29 quoted above and insisted that the existence of the Rainwater Statement had been divulged to plaintiffs well in advance of trial. Without reviewing in camera the Rainwater Statement, the trial court ruled that the statement was not subject to the subpoena duces tecum or discovery because it was Courtesy’s work product.
La. C.C.P. art. 1424 governs the discov-erability of information commonly referred to as work product, providing in pertinent part:
The court shall not order the production or inspection of any writing obtained or prepared by the adverse party, his attorney, surety, indemnitor, expert, or agent in anticipation of litigation or in preparation for trial unless satisfied that denial of production or inspection will unfairly prejudice the party seeking the production or inspection in preparing his claim or defense or will cause him undue hardship or injustice.
Our supreme court has referred to the work product privilege in reviewing Article 1424 as a qualified privilege. Wolford v. JoEllen Smith Psychiatric Hospital, 96-2460 (La.5/20/97), 693 So.2d 1164, 1166.
The test for overcoming the privilege requires a showing of prejudice and undue hardship in preparing a party’s claim and has been compared to the federal discovery rule, Fed.R.Civ.P. 26(b)(3), which requires “a showing that the party seeking discovery has substantial need of the materials in the preparation of the party’s case and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means.” Ogea v. Jacobs, 344 So.2d 953, 957 (La.1977) (interpreting the terms “unfair prejudice” and “undue hardship” as used in La. C.C.P. art. 1424 in relation to the federal discovery rules from which the Louisiana discovery provisions were derived).
*181 The plaintiffs’ “substantial need” for the Rainwater Statement was readily apparent from the fact that Rainwater was the only person to examine the exhaust system while intact in the vehicle prior to the accident and, most significantly, was Nthe person who had ordered the EGR tube. Courtesy’s argument that the Rainwater Statement was cumulative in view of all other evidence presented at trial goes more to the question of the prejudicial effect of the trial court’s ruling addressed below. Also, plaintiffs’ inability to have previously communicated with Rainwater, because of Rainwater’s unavailability as a witness due to his absentee status, was not in dispute. Nevertheless, the difficulty which the trial court properly had with plaintiffs’ subpoena was its timing as a belated request for discovery of a document which Courtesy asserted had already been identified as work product well over one year before trial. While such last minute motion raising a stale discovery dispute would be clearly within the trial court’s discretion to deny, we find Courtesy’s argument to the trial court regarding its prior identification of the Rainwater Statement clearly wrong and misleading. The misleading nature of the argument is difficult to overcome absent a reading of the Rainwater Statement in comparison to Courtesy’s interrogatory answers, something which the plaintiffs could not perform and which the trial court did not elect to undertake in camera.
The Rainwater Statement, which only after trial found its way into this record under unusual procedural circumstances, has been considered by this court in comparison to Courtesy’s June 1993 answers to discovery reviewed above. The undisputed fact revealed in the Rainwater Statement is that Rainwater would not have ordered the EGR tube unless he observed an exhaust leak. If, after attempting to tighten the tube, a leak was observed by Rainwater at the fitting on either end of the tube, he would order the EGR tube as a matter of his general practice. In reviewing the November 21 Service Order with the adjuster, Rainwater recalled the clicking noise as reported by Cecil and that he had | ^attempted to stop the leak at one of the fittings for the EGR tube before deciding to order the tube.
La. C.C.P. art. 1428(2) discusses the ongoing duty of a party to supplement responses to discovery, as follows:
(2) A party is under a duty seasonably to amend a prior response if he obtains information upon the basis of which he knows that the response was incorrect when made, or he knows that the response though correct when made is no longer true and the circumstances are such that a failure to amend the response is in substance a knowing concealment.
Courtesy’s answers to plaintiffs’ interrogatories were clearly made without acknowledging that Rainwater had worked on Cecil’s truck on November 21 and had investigated the report of the clicking sound in relation to the exhaust system. Nevertheless, that information was later discovered by plaintiffs when the November 21 Service Order was produced by Courtesy, see footnote 1, supra. More significantly, as to the critical question regarding why the EGR tube was ordered (interrogatory number 11), Courtesy elected to answer that Rainwater ordered the part “because the buildup of carbon deposits results in poor engine performance.” [2] Also the answers indicated that in June 1993, Rainwater was no longer an employee of Courtesy and his address was unknown, casting in doubt whether Courtesy’s statements from its employees included any statement from Rainwater.
*182 These substantive answers by Courtesy pertaining to Rainwater’s actions or inac-tions with the vehicle must then be read in conjunction with Courtesy’s answer that it had written statements from its employees. Assuming, as Courtesy argues, that its interrogatory answer identified Rainwater as an employee who had given a statement, the plaintiffs could only assume from the thrust of all interrogatory |-^answers that such statement did not reveal that Rainwater worked on the vehicle on November 21,1989 and that it recorded his reason for ordering the EGR tube as quoted in Courtesy’s answer to interrogatory number 11. Such a statement by Rainwater which did not clearly identify an exhaust leak as the purpose for ordering the EGR tube would discourage any attempt to require the production of the statement under La. C.C.P. art. 1424.
Most troubling to us is the failure of Courtesy to have supplemented its answers to interrogatory number 11 after the preparer of the answers later learned the substance of the November 21 Service Order and the Rainwater Statement. Those two documents could not have been reviewed prior to a good faith preparation of Courtesy’s answers to interrogatory numbers 9, 10 and 11. Since the Rainwater Statement says that he ordered the EGR tube because he observed a leak in the exhaust system, Courtesy breached its duty under La. C.C.P. art. 1428(2) to amend its response to interrogatory number 11. Courtesy may not argue to the trial court that plaintiffs’ motion for the Rainwater Statement was untimely and in violation of the work product privilege when its failure to amend the substance of its answers to interrogatory number 11 misled the plaintiffs and the trial court. The trial court’s failure to have properly considered both the Rainwater Statement and Courtesy’s interrogatory responses in making its ruling under La. C.C.P. art. 1424 was therefore error.
We next consider whether the discovery of the Rainwater Statement denied to plaintiffs by the trial court’s ruling amounted to prejudicial error. First, we note that the Rainwater Statement, had it been revealed in discovery to plaintiffs, was admissible evidence. As to Courtesy, the Rainwater Statement was an authorized admission made by Courtesy’s employee who had the training and authority to perform service on the vehicle and make the decision regarding repairs. La.Code | uEvid. art. 801(D)(2)(c). Pacholik v. Gray, 187 So.2d 480 (La.App. 3d Cir.1966) and Dykes v. Peabody Shoreline Geophysical, 482 So.2d 662 (La.App. 1st Cir.1985). Although Rainwater was not Ford’s agent, his statement was admissible as to Ford as a statement against interest by an unavailable witness which is a hearsay exception under La.Code Evid. art. 804(B)(3). Campbell v. American Home Assurance Company, 260 La. 1047, 258 So.2d 81 (1972).
As to the test for prejudicial error, our supreme court has given the following guidance:
Error has been defined as harmless when it is “trivial, formal, merely academic, and not prejudicial to the substantial rights of the party assigning it, and where it in no way affects the final outcome of the case.” 5 Am.Jur.2d, Appeal and Error § 776 (1962) (citing State v. Britton, 27 Wash.2d 336, 341, 178 P.2d 341, 344 (1947)); Eastburn v. Ford Motor Co., 471 F.2d 21, 22-23 (5th Cir.1972) (applying Florida law). By contrast, prejudicial error “affects the final result of the case and works adversely to a substantial right of the party assigning it.” 5 Am.Jur.2d, Appeal and Error § 776 (1962); see also 5A C.J.S. § 1676 (1958). Moreover, error is prejudicial when it consists of the exclusion of evidence related to a “material point in issue” and adversely affects the substantial rights of the party opposed to the exclusion. 5Am.Jur.2d, Appeal and Error § 776 (1962).
Buckbee v. United Gas Pipe Line Co., Inc., 561 So.2d 76, 85 (La.1990).
*183 The Rainwater Statement had obvious relevance to the issue of the exhaust leak which at trial was a “material point in issue.” Plaintiffs attempted to prove the existence of the exhaust leak by evidence of the November 21 Service Order, the ordering of the EGR tube, a test for soot on the EGR sleeve, the damaged EGR valve and fitting where the EGR tube connected, the overall circumstances of the accident, and the prior symptoms of headaches, lethargy, etc. experience by Cecil and Eric. The defendants cast doubt on each aspect of plaintiffs’ proof of the leak to the extent that defendants’ expert was able to testify that no leak existed. Their defense of this issue showed: (i) the EGR tube which Rainwater decided to replace had no leak, (ii) the damage to the EGR valve could have been caused by |1Bthe accident, (iii) the soot on the EGR sleeve was burned resin from the sleeve itself, (iv) the clicking noise could result from a loose spark plug wire, and (v) the circumstances of the accident indicated a driver falling asleep.
Given the above dispute and conflicting evidence, the jury’s answer to its initial interrogatory that CO was not a causal factor in the accident could have rested upon a finding that no leak in the exhaust system was proven by plaintiffs. Presented with two contradictory views of that issue, in the absence of the Rainwater Statement, the jury could reasonably have accepted the defendants’ body of evidence that no exhaust leak existed. Therefore, despite the other important areas of factual dispute concerning the potential level of CO build-up in the cab, the circumstances of the accident and the possible symptoms of CO poisoning, the jury need not have reached those disputes upon a finding of no exhaust leak.
The defendants, nevertheless, argue that the Rainwater Statement would have been merely cumulative evidence which would not have affected the determination regarding the existence of an exhaust leak. We disagree.
Randy Rainwater was the only eyewitness who examined the truck’s EGR exhaust system before the accident on December 4, 1989. In his lengthy recorded statement with the adjuster, Rainwater was repeatedly asked at least five times regarding his recollection of finding an exhaust leak in Cecil’s truck. The November 21 Service Order was used by the adjuster to refresh Rainwater’s recollection of his inspection of the vehicle. Rainwater also recalled specific details which exhibited his independent recollection of Cecil’s truck even though he stated that he had worked on other trucks with the same exhaust leak problem. Throughout his statement, Rainwater never wavered in his testimony that he discovered an exhaust leak at one of the fittings for the EGR tube. He confirmed 11fithat he could identify such leak-by feeling the leak, seeing evidence of soot on the EGR sleeve, and/or hearing the clicking sound. In response to each of the five questions presented in various forms and at different times in the questioning, Rainwater confirmed the existence of the leak stating that he would not have ordered the EGR tube unless he had attempted to tighten the tube and had failed to stop the leak. With that eyewitness testimony, the issue of an exhaust leak, which was otherwise placed in substantial doubt at trial for the jury to decide, is removed from the case. The direct evidence of the leak which Rainwater’s observation provides can hardly be labeled cumulative in relation to the circumstantial evidence over which both sides battled before the jury.
In summary, the Rainwater Statement was improperly withheld from plaintiffs after a request for its production was made pursuant to La. C.C.P. art. 1424. The relevant portions of the statement were admissible evidence under La.Code Evid. arts. 801 and 804. The evidentiary error in excluding the Rainwater Statement was prejudicial since it could adversely affect the jury’s conclusion on a-material point in issue.
*184 II.
When the jury is tainted by incorrect and prejudicial instructions or rulings on admissibility of evidence in a tort case, the jury’s liability decision is not entitled to any deference, and the appellate court decides the case on the record without according any weight to the jury’s liability decision. Gonzales v. Xerox Corp., 320 So.2d 163 (La.1975); Buckbee, supra. An exception to this de novo consideration was stated by the supreme court in Ragas v. Argonaut Southwest Insurance Co., 388 So.2d 707, 708 (La.1980) as follows:
Where a finding of fact is interdicted because of some legal error implicit in the fact finding process or when a mistake of law forecloses any finding of fact, and where the record is otherwise ' 117complete, the appellate court should, if it can, render judgment on the record.
This is not to say, and Gonzales should not be read to require, that the appellate court must find its own facts in every such case. There are cases where the weight of the evidence is so nearly 'equal that a firsthand view of the witnesses is essential to a fair resolution of the issues. The appellate court must itself decide whether the record is such that the court can fairly find a preponderance of the evidence from the cold record. Where a view of the witnesses is essential to a fair resolution of conflicting evidence, the case should be remanded for a new trial.
Considering the Gonzales/Ragas test for de novo review, we find that the record produced by this 22-day trial is complete.' Conflicting testimony requiring credibility calls between witnesses does not predominate. The testimony of Kesee, Anding and Trooper Stevens reports the evidence of the accident and the accident scene which is- not disputed by other witnesses. The availability of Randy Rainwater remained unclear even after trial during the parties’ dispute regarding plaintiffs’ motion- for new trial. There is no assurance that he would not remain an absentee witness elusive to service upon a remand for a new trial so that a new jury would only consider his 1990 statement which we have now reviewed. Most significantly, in view of the extremely slow pace of this litigation concerning an accident which occurred ten years ago, new testimony by the witnesses would be presented under a cloud of doubt due to the lengthy passage of time. Accordingly, with a complete record that does not warrant remand, we are required under Gonzales to exercise our constitutional authority to review the facts of this record de novo in the interest of judicial economy.
III.
With our finding of an exhaust leak at the connection between the EGR tube and the EGR valve, we now consider the remaining evidence. Plaintiffs presented evidence of tests for CO using another Ford F-250 truck of the same model year. The tests measured the amounts of CO in the truck cab and in the |isengine compartment under various simulated conditions. Significantly, with the engine combustion performing at normal levels, the tests showed that upon disconnecting the EGR tube entirely from the EGR valve the exhaust flowing directly into the engine compartment did not increase CO inside the cab to a dangerous level. It was only after the air/fuel combustion ratio was altered to increase the fuel level and cause a rich running engine that dangerous levels of CO accumulated in the cab.
The plaintiffs attempted to show that the Masters’ truck was experiencing a rich running engine by pointing to certain clues. On the November 21 Service Order, Cecil had reported that the engine “blows black smoke sometimes.” After the accident, the plaintiffs’ mechanic found three parts of the engine which he considered as evidence of a rich running engine. First, some of the eight spark plugs showed signs of excessive fouling with a residue which indicated to plaintiffs’ expert the burning of excessive fuel. Next, he *185 suggested that a cause of the excessive fuel ratio was a broken thermostat which he found inside the cooling system of the truck. With a broken thermostat, the engine, in his opinion, would never reach its normal operating temperature thus causing the computer sensors for the fuel injection engine to maintain a higher fuel to air ratio. Finally, he also pointed to a clogged oxygen sensor from the vehicle as a second mechanical flaw which would cause an excessive fuel to air ratio.
The defendants disputed this evidence by pointing out that the plaintiffs’ mechanic did not find the broken thermostat or clogged oxygen sensor until more than four years after the accident and the truck’s location during some of the interim time was unaccounted for. The defense expert witnesses also stated that the spark plugs from Cecil’s truck did not look like they came from an engine burning excessive fuel because they were not all uniformly discolored; they | ^attributed the discoloration to possible oil seepage by the valve seals. As to the black smoke, defendants’ witnesses testified that a few puffs of black smoke on the initial crank of a fuel-injected engine is normal because the computer richens the fuel mixture to start the vehicle but a rich running engine will emit black smoke constantly, not just intermittently. Finally, although he did not specifically remember Cecil or his truck, Larry Fuller, a mechanic for Courtesy, testified that upon such a complaint, he may have used his computer diagnostic equipment to cheek out the engine. The notation of “no problem found” on the November 21 Service Order concerning the black smoke problem indicated to Fuller that the computer testing was probably run even though no notation specifically reporting such testing was listed on the order.
From our review of this controversy, while we may accept the circumstantial evidence of the possibility of a mechanical flaw causing a rich running engine, there is considerable doubt that the fuel/air ratio of the Masters’ truck was abnormal and no proof regarding the level of the richness of the fuel mixture. Only about half of the eight spark plugs appear to be fouled for whatever reason, and the plaintiffs’ explanation for their fouling — the thermostat and/or oxygen sensor problem — would appear to us to impact uniformly the optimum combustion in every cylinder.
Moreover, the plaintiffs’ tests for a rich running engine were generated by a totally different problem which all agree was not a problem in the Masters’ truck. The plaintiffs simulated a rich running engine by disconnecting the MAP sensor of the exemplar vehicle. This resulted in an excessively rich fuel mixture with unpleasant side effects of engine roughness and stalling, all of which conditions were not shown to have existed in the Masters’ truck. While we understand that this was only a simulation, the excessively high fuel/air ratio exhibited and the | ^corresponding high levels of CO produced were probably not present in the Masters’ truck. No tests were performed simulating the effects of a broken thermostat or clogged oxygen sensor, and there was no testing of CO levels produced by a vehicle with only a moderately rich fuel/air ratio. We are left with proof of only the extreme — an excessively rich running engine producing excessive CO and obnoxious engine side effects. If the Masters’ truck suffered from a moderately rich running condition, the evidence for the cause of that condition and the potential level of CO produced by that condition is lacking.
Another problem which the plaintiffs’ simulations did not overcome concerned the marked decrease in CO levels inside the cab which occurred after the truck left an idle state and accelerated to highway speeds. Even the plaintiffs’ expert agreed that while the CO reached dangerously high levels when the truck idled with the EGR tube and EGR valve separated and the MAP sensor disconnected, by the time the truck traveled three miles at 55 m.p.h., the CO level inside the cab was insignifi *186 cant. Dr. David Stafford, plaintiffs’ toxicology expert, testified that CO eliminates very slowly from the body in fresh air. The half life of CO concentrations in the blood in the form of carboxyhemoglobin is four to six hours. Shortly before the accident, Cecil and Eric were out of the truck at a job site for 45 minutes to an hour. Jessie Masters, who was present at the job site, testified that Cecil appeared fine that morning and did not complain of any health problems. Cecil and Eric then drove to a gas station where they again both got out of the truck. After Cecil and Eric left the gas station until the accident, Eric was driving at highway speeds. Although earlier in the morning on December 4, Eric, in particular, remained inside the truck for periods of time while it idled, the evidence showed that during the approximately hour and a half preceding the accident, Eric and Cecil were primarily out of the truck and apparently functioning | ai normally or were driving at 45-55 m.p.h. Although Dr. Stafford stated that a person would pass out when the concentration of carboxyhemoglobin in the blood reached the 20%-30% level, the defendants’ toxicologist cited literature putting loss of consciousness at a 40%-60% level. In either case, both toxicologists agreed that for the concentration level in the blood to continue rising, a person would have to be continuously exposed to a high level of CO. Nevertheless with the truck driver, Kesee, following behind the Masters’ vehicle at highway speeds for many miles, the undisputed evidence indicates that there could have been no large concentration of CO in the truck cab immediately prior to the accident regardless of the level of-richness of the engine combustion.
A final body of evidence which relates to the operating condition of the truck is the truck’s mileage record and the record of the weather conditions preceding the accident. From November 21 to the accident, the truck was driven 1301 miles. From Rainwater’s testimony, the exhaust leak existed before November 21 and may well have existed throughout its entire 12,924-mile history. There were other cold days in November and December of that year. From this circumstantial evidence, noticeable symptoms of CO poisoning by occupants of the truck would most probably have been reported if the truck presented the dangerous potential for high levels of CO which the plaintiffs assert.
The weight of the evidence regarding the mechanical functioning of the vehicle therefore falls short of demonstrating a rich running engine and corresponding dangerous levels of CO inside the truck cab throughout the morning of the accident. Nevertheless, plaintiffs insist that the unusual circumstances of the accident itself demonstrate that CO could have been the only cause for the accident. Since, as stated above, there is circumstantial evidence for the possibility for rich combustion and Eric’s exposure to CO while the truck was left idling on l^the morning of the accident, we have additionally reviewed the unusual circumstances of the accident.
The accident reconstruction experts for both sides agreed that the description of the accident as witnessed by Kesee and the tracks of the vehicle as it left the pavement indicate an unconscious driver, whether due to falling asleep or CO intoxication. From all the circumstances of this case, we cannot conclude when comparing these two unusual scenarios- — sleep or CO poisoning — that the possibility of either tends to exclude the other.
One large piece of the puzzle is Eric’s condition leading up to the accident. Eric testified that on the morning of the accident he did not feel dizzy or nauseated or suffer from a headache. He likewise did not report being tired or sleepy upon finishing his mid-morning snack immediately prior to the accident. He reported a lack of memory of his driving of the vehicle from a time shortly after leaving the gas station as he began the trip along the rural highway to Farmerville. The last thing he *187 remembers is his father’s picking up the newspaper to work the crossword puzzle. Eric’s condition is then reported on solely by Kesee who followed behind Eric for the final ten minutes. Kesee witnessed a driver operating the pickup in a proper and normal manner. Most telling is Kesee’s description of Eric’s alertness in slowing with other traffic in Rocky Branch almost immediately prior to the accident.
From this evidence, there is no sign of either a sleepy or intoxicated driver. We cannot attribute Eric’s lack of memory to a diminished state of consciousness. While symptoms of CO poisoning present differently from individual to individual, the expert toxicologists indicated that CO poisoning can produce a type of semi-consciousness and momentary lapse of consciousness, like one fighting sleep. Nevertheless, Eric negotiated the hills and turns of the rural road and ^responded to other traffic up until the immediate few seconds before the accident. The change from normal driving to the abnormal sudden occurrence in this case is difficult to understand from either the scenario of sleep or CO intoxication.
The plaintiffs’ insistence that CO was the cause of this accident rests heavily on the following circumstantial evidence. First, Kesee reported no sign of Cecil as he followed the pickup for many miles. Kesee at one point maneuvered to begin passing the Masters’ vehicle only to fall back as Eric increased his speed, but he never saw Cecil inside the cab. The circumstance of Erie being a new fifteen-year-old driver likewise raises the inference that both father and son might be more attentive and cautious on the highway. Next, the testimony of Anding, the nurse, reported Cecil’s bright red blood. This according to the toxicologists is indicative of excessive carboxyhemoglobin in the blood. The plaintiffs also produced testimony from persons noting Cecil’s and Eric’s reports of headaches. Finally, despite the competing testimony of the forensic pathologists, the plaintiffs urge that Cecil’s autopsy indicates that some cause other than the physical injuries to Cecil’s chest contributed to his death. Recording to plaintiffs, that cause as proven by this body of circumstantial evidence is CO poisoning.
In considering circumstantial evidence, our supreme court has stated:
It is an elementary proposition that causation may be proved by circumstantial evidence. In many instances, it can be proved only by such evidence. Taken as a whole, circumstantial evidence must exclude other reasonable hypotheses with a fair amount of certainty. This does not mean, however, that it must negate all other possible causes.
Lombard v. Sewerage and Water Bd. of New Orleans, 284 So.2d 905, 918 (La.1973). See also, Aetna Life and Casualty Company v. Solloway, 25,462 (La.App.2d Cir.1/19/94), 630 So.2d 1353.
From our consideration of the circumstantial evidence offered by plaintiffs, we are not persuaded by either the evidence of Cecil’s and Eric’s prior symptoms | ¡^nor the opinion of Dr. McCormick. The reports of headaches and lethargy did not significantly indicate that those symptoms were out of the ordinary from normal health discomforts. The autopsy report was performed on a badly decomposed body and therefore could not fully explore the possibilities of other injuries which may have contributed to Cecil’s death. In sum, the inferences which can be drawn from all of plaintiffs’ evidence do not sufficiently suggest CO poisoning as the cause of the accident. When considered with the automotive evidence concerning the narrow possibility for excessive CO in the truck cab, plaintiffs’ case remains in doubt.
Finally, the most significant and undisputed evidence concerns the critical timing for the accident. In the last 250 feet as the truck drifted over into the oncoming lane of traffic, left the pavement, and hit the tree, the elapsed time was between four and five seconds. Upon leaving the *188 pavement, the angle of departure suddenly-thrust the vehicle beyond the narrow gravel shoulder down a sharp embankment in the final 1.8 seconds before impact. Both accident reconstruction experts agreed that a braking reaction for even a conscious, inattentive driver would probably not occur after leaving the pavement. The force of the sudden shift of the truck to the left as it veered down the embankment could easily have thrown Eric to the left, whether conscious or not. In this last brief time span, the prior control of a properly driven vehicle was suddenly lost, and once the truck left the highway there was little that even the most experienced driver could have done to recover. From this view of the evidence, the plaintiffs did not exclude as a reasonable cause of the accident the possibility of the young driver’s inattentiveness during this brief five-second interval. That possibility and the additional possibility of Eric’s falling to sleep were not excluded with a fair | ¡^amount of certainty by the inferences which the plaintiffs urge us to draw from the circumstantial evidence of CO poisoning.

Conclusion

Despite the critical withholding of evidence of the exhaust leak which tainted the jury’s verdict, our de novo review of the evidence for this puzzling accident requires us to conclude that the possibility of CO poisoning does not preponderate above other reasonable hypotheses for the cause of the accident. The plaintiffs’ case resting largely upon circumstantial evidence, we are not convinced that CO poisoning caused this accident, and we affirm the trial court’s judgment. Costs are assessed to appellants.
AFFIRMED.
BROWN, J., concurs and dissents with reasons.

. Plaintiffs claim that despite these interrogatories and a request for production of documents, the November 21 Service Order was never revealed until Courtesy’s service manager, Bill Dabbs, mentioned Rainwater’s work and the missing Service Order in his deposition in late 1993. The deposition was *180 stopped while the Service Order was retrieved.

. Whether Courtesy was required to answer interrogatory number 11(b) concerning Rainwater’s reason for ordering the EGR tube was not made an issue in Courtesy's response to the interrogatory. Once Courtesy elected to disclose a reason, it could not state a misleading reason contrary to Rainwater's actual purpose.