828 So.2d 1212 (2002)
Mary Ann TURNER
v.
Alan J. OSTROWE.
No. 2001 CA 1935.
Court of Appeal of Louisiana, First Circuit.
September 27, 2002.
Rehearing Denied November 5, 2002.
*1214 Richard Ducote, New Orleans, for Plaintiff-Appellant-Appellee Mary Ann Turner.
Lewis O. Unglesby, Baton Rouge, for Defendant-Appellee-Appellant Alan J. Ostrowe.
Before: CARTER, C.J., PARRO, and CLAIBORNE,[2] JJ.
PARRO, J.
In this appeal of a judgment in her favor, Mary Ann Turner contends the trial court's $35,000 general damage award for her physical and psychological injuries is abusively low. Her ex-husband, Dr. Alan J. Ostrowe, against whom the judgment was rendered, also appealed, claiming the trial court's judgment in favor of Turner is legally and manifestly erroneous. We amend the judgment and affirm as amended.

FACTUAL AND PROCEDURAL BACKGROUND
This is a factually unusual, legally challenging, and emotionally charged case with a long history dating back to an event that occurred in 1972. Turner claims in this lawsuit that in 1972, her then-husband, Dr. Alan J. Ostrowe, an anesthesiologist, conspired with another Baton Rouge physician, Dr. Anthony B. Leggio, an obstetrician/gynecologist, to have a surgical procedure performed on her without her knowledge or consent. This procedure, sometimes called female circumcision, consists of the removal of the clitoral prepuce, which is the flap of skin that partially covers and protects the clitoris.[3] *1215 Dr. Leggio is deceased and unavailable to testify, but hospital records from Turner's 1972 surgery indicate that Dr. Leggio did, in fact, remove the prepuce of her clitoris, in addition to performing a "D & C" and posterior repair of a rectocele and perineal ulcer.[4] Turner claims she endured severe pain for months following the surgery and was kept heavily sedated by Ostrowe during that time. Turner and Ostrowe eventually separated for other reasons and were divorced in 1983. Turner contends she believed the only surgery done during her 1972 hospitalization was the posterior repair, and she did not find out until late May or early June of 1988 that a female circumcision had been performed on her at Ostrowe's request. Ostrowe's response is that the couple discussed this procedure after reading about it, that Turner agreed to have a female circumcision in order to energize their sexual relationship, and that she knew and consented to the surgical procedure. Turner vehemently denies this and claims the discovery that she had been genitally mutilated and so intimately betrayed by her then husband caused her serious emotional trauma in addition to the permanent residual physical effects of the surgery. These physical effects included both hypersensitivity and, conversely, numbness of her clitoral area, causing pain and a loss of sexual pleasure. This suit, seeking damages from Ostrowe for her physical and emotional injuries, was filed April 28, 1989.
On October 20, 1989, Ostrowe filed a peremptory exception raising the objection of prescription. After years of discovery alternating with stretches of inactivity, the exception was eventually tried; it was overruled on October 21, 1994. A motion for summary judgment filed by Ostrowe and opposed by Turner was denied December 5, 1994. In April 1996, Ostrowe filed a "motion for new trial" on the prescription issue, claiming new facts bearing on this issue had been discovered. The prescription exception was referred to the merits, and on October 17, 1996, this court denied Turner's writ application contesting that ruling.[5] A jury trial commenced October 29, 1996, but ended in a mistrial on October 31, 1996. Ultimately, the parties agreed to a bench trial, which was held in March 2001.
In extensive written reasons, the trial court ruled in favor of Turner, finding that Ostrowe had been instrumental in having the female circumcision performed on her, that she did not learn about this surgery until 1988, and that her failure to discover the condition was reasonable. A judgment was signed April 6, 2001, awarding her $35,000 in general damages, plus interest from date of judicial demand and court costs.[6] Both parties filed motions for new trial, both of which were denied. Turner then appealed the quantum of the damage award, claiming the trial court applied a legally incorrect standard in making the award and that it was an abuse of discretion. *1216 Ostrowe also appealed, urging the trial court erred in making certain evidentiary rulings and claiming manifest error with respect to the court's factual findings. He also claims that, because Turner's comment during the first trial resulted in the mistrial and resultant delay in the litigation, he should not have to pay judicial interest on the entire period from date of judicial demand.

STANDARD OF REVIEW
The appellate court's review of factual findings is governed by the manifest errorclearly wrong standard. The two-part test for the appellate review of a factual finding is: 1) whether there is a reasonable factual basis in the record for the finding of the trial court, and 2) whether the record further establishes that the finding is not manifestly erroneous. Mart v. Hill, 505 So.2d 1120, 1127 (La.1987). Thus, if there is no reasonable factual basis in the record for the trial court's finding, no additional inquiry is necessary. However, if a reasonable factual basis exists, an appellate court may set aside a trial court's factual finding only if, after reviewing the record in its entirety, it determines the trial court's finding was clearly wrong. See Stobart v. State, through Dep't of Transp. and Dev., 617 So.2d 880, 882 (La.1993). Furthermore, when factual findings are based on the credibility of witnesses, the fact finder's decision to credit a witness's testimony must be given "great deference" by the appellate court. Rosell v. ESCO, 549 So.2d 840, 844 (La. 1989). Even though an appellate court may feel its own evaluations and inferences are more reasonable than the fact finder's, reasonable inferences of fact should not be disturbed upon review where conflict exists in the testimony. Stobart, 617 So.2d at 882. Where there are two permissible views of the evidence, the fact finder's choice between them cannot be manifestly erroneous or clearly wrong. Stobart, 617 So.2d at 883.
A legal error occurs when a trial court applies incorrect principles of law and such errors are prejudicial. Legal errors are prejudicial when they materially affect the outcome and deprive a party of substantial rights. When such a prejudicial error of law skews the trial court's finding of a material issue of fact and causes it to pretermit other issues, the appellate court is required, if it can, to render judgment on the record by applying the correct law and determining the essential material facts de novo. Evans v. Lungrin, 97-0541, 97-0577 (La.2/6/98), 708 So.2d 731, 735.
Generally, the trial court is granted broad discretion on its evidentiary rulings and its determinations will not be disturbed on appeal absent a clear abuse of that discretion. Belle Pass Terminal, Inc. v. Jolin, Inc., 92-1544 (La.App. 1st Cir.3/11/94), 634 So.2d 466, 476-77, writ denied, 94-0906 (La.6/17/94), 638 So.2d 1094.
Much discretion is left to the judge or jury in the assessment of general damages. LSA-C.C. art. 2324.1. In reviewing an award of general damages, the court of appeal must determine whether the trier of fact has abused its much discretion in making the award. Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1260 (La. 1993), cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994). It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award. Youn, 623 So.2d at 1261. Only after it is determined that there has been an abuse of discretion is a resort to prior awards appropriate, and then only to *1217 determine the highest or lowest point of an award within that discretion. Coco v. Winston Indus., Inc., 341 So.2d 332, 335 (La.1976); Dennis v. The Finish Line, Inc., 99-1413 (La.App. 1st Cir.12/22/00), 781 So.2d 12, 30, writ denied, 01-0214 (La.3/16/01), 787 So.2d 319.

ANALYSIS
Dr. Leggio's Statements to Dr. Pizzolatto
We address first Ostrowe's assignment of error claiming the trial court committed reversible error when it allowed into the record the "clear hearsay" testimony of Dr. Karl Pizzolatto, in which he recounted a comment allegedly made to him by Dr. Leggio.[7] Dr. Pizzolatto assisted Dr. Leggio in performing the 1972 surgery on Turner.[8] Dr. Pizzolatto testified that while he and Dr. Leggio were in the surgical suite and after the posterior repair was finished, Dr. Leggio whispered to him that there was an additional procedure to be done and described the female circumcision. When Dr. Pizzolatto asked why such an unusual procedure was being performed, Dr. Leggio purportedly responded that he was doing it as a favor to Ostrowe and that Turner did not know about it. Ostrowe objected to this entire line of testimony as hearsay and it was proffered.
However, on cross examination of Dr. Pizzolatto, Ostrowe's attorney initiated the following colloquy:
Q Do you have any evidence, by the way, do you yourself, Dr. Pizzolatto, have any knowledge at all that Dr. Leggio kept this a secret from Mary Ann Turner?
A Yes, I do.
Q That Dr. Leggio kept it a secret?
A Yes.
Q What is your testimony?
A He said to me when we discussed this case that Dr. Ostrowe wanted this done because Mary Ann wasn't sensitive enough sexually, and Mary Ann didn't know it was being done.
When hearsay evidence is not timely objected to, it becomes competent evidence and may be considered as any other admissible evidence. State v. Marcal, 388 So.2d 656, 660-61 (La.1980), cert. denied, 451 U.S. 977, 101 S.Ct. 2300, 68 L.Ed.2d 834 (1981). Although Ostrowe's counsel objected to any and all of Dr. Pizzolatto's testimony on direct examination concerning statements made to him by Dr. Leggio, resulting in those statements being preserved as a proffer, on cross examination, Ostrowe's attorney elicited this same testimony from Dr. Pizzolatto and expanded on it. We are inclined to affirm the trial court's evidentiary ruling on this basis alone. However, there was obviously some confusion about whether the cross examination was also considered part of the proffer, so we will examine the legal basis for the trial court's ruling.
The trial court based its ruling on Louisiana Code of Evidence article 801(D)(3)(b). Under that provision, a statement is not hearsay if it is offered against a party and is made by a declarant while participating in a conspiracy to commit a crime or civil wrong and in furtherance of the objective of the conspiracy, *1218 provided that a prima facie case of conspiracy is established. Ostrowe takes issue with the trial court's conclusion that a prima facie case of conspiracy had been established between him and Dr. Leggio to perform this surgery on Turner without her knowledge or consent, which is a civil battery. The trial court found there was sufficient evidence of such a conspiracy to admit Dr. Leggio's statements as a co-conspirator with Ostrowe.
A prima facie case of conspiracy is presented when evidence is introduced which, if unrebutted, would be sufficient to establish the facts of the conspiracy. State v. Nall, 439 So.2d 420, 425 (La.1983). Statements made by co-conspirators, which are the object of the hearsay objection, may be considered by the trial court in making its determination as to whether a prima facie case of conspiracy has been established. State v. Lobato, 603 So.2d 739, 746 (La. 1992). A trial court's determination as to the admissibility of such evidence will not be overturned absent clear error. Lobato, 603 So.2d at 747.
Our evaluation of the record reveals considerable evidence supporting the prima facie case of conspiracy between Ostrowe and Dr. Leggio. Ostrowe admitted that after he read an article about female circumcision as a means of enhancing a woman's sexual response, he became interested in having this procedure done on his wife for that purpose. He also admitted recommending to his wife that she go to Dr. Leggio for the posterior repair that Ostrowe thought she needed after the birth of their third child. Ostrowe further acknowledged that before his wife saw Dr. Leggio, he discussed with Dr. Leggio the possibility of performing a female circumcision on his wife. Of course, Ostrowe also said he and Turner jointly agreed that she would undergo the procedure; Turner denies ever discussing it with him or Dr. Leggio. Turner recalled that during her only office examination by Dr. Leggio before the surgery, he made a brief mention that she may have some excess tissue covering the clitoris, but did not suggest removing it and did not discuss it further, recommending only the posterior repair and D & C.[9]
The consent for surgery that Turner signed did not describe any of the procedures to be performed. Ostrowe admitted giving her pre-operative sedatives. Although in a deposition Ostrowe denied six times that he was present in the operating room or even in the hospital during the surgery, Ostrowe admitted at trial, and Dr. Pizzolatto confirmed, that he was in the operating room next to the operating table while the surgery, including the female circumcision, was performed. The hospital charts from Turner's nine-day post-operative hospitalization show that Dr. Leggio left orders that Ostrowe could prescribe or administer medications to his wife. The medications given her during this period were described by other doctors who testified as heavy doses of sedatives and pain killers. Although Ostrowe denied administering any drugs to Turner in the hospital, Dr. Pizzolatto testified that he twice saw Ostrowe injecting his wife with valium. These injections do not appear on the hospital record. The removal of the clitoral prepuce also does not appear anywhere in the hospital records until three months following the surgery when the complete operative notes and progress notes were dictated for the record by Dr. Leggio. As Dr. Pizzolatto noted concerning this, "If you want to keep it a secret, you dictate it *1219 three months after it happened because nobody reads the records." Turner testified that after she got home from the hospital, she was in excruciating pain and Ostrowe kept her heavily sedated for several months until the incisions healed.
Turner said because she thought Dr. Leggio must have "botched" the posterior repair somehow, she did not return to him. Almost a year later, she went to a different obstetrician/gynecologist, Dr. Robert DiBenedetto, and complained to him about continuing pain in the vaginal area, especially during sexual intercourse. He purportedly told her there was nothing wrong with her physically, and she should relax, drink wine, and "think exotic thoughts" in order to enjoy sexual activity. Dr. DiBenedetto's testimony from the first trial is in the record;[10] he said she complained of dyspareunia, painful intercourse, and he examined her looking for a specific cause of that problem. But he said he knew only about the posterior repair that had been done and nothing about a circumcision of the clitoris, and did not find vaginal scar tissue or anything that could have caused her problem. Dr. DiBenedetto said Turner was unaware of the female circumcision, and so was he, until many years later when she told him what she had learned from Dr. Pizzolatto. Dr. Pizzolatto, Turner, and Turner's close friend, Lori Radzikowski, testified that when Dr. Pizzolatto told Turner about the female circumcision in 1988, her reaction was obvious shock, dismay, and near-hysteria. Dr. Pizzolatto said that although he knew Turner did not know about the female circumcision when it was done in 1972, he had assumed that in the intervening years, she had found out about it. He said he regretted that his comments in 1988 had "let the cat out of the bag" after so many years and caused her so much distress.
The cumulative effect of this evidence suffices to establish a prima facie case that Ostrowe and Dr. Leggio conspired to perform a female circumcision on Turner without her knowledge or consent, which is a civil battery.[11] The statements made by Dr. Leggio to Dr. Pizzolatto during and after the surgical procedure were in furtherance of that conspiracy, in that Dr. Pizzolatto was assisting in the surgery. Also, by telling Dr. Pizzolatto that Turner did not know of the female circumcision, the clear implication was that Dr. Pizzolatto should join Dr. Leggio and Ostrowe in keeping the matter secret from her. Therefore, the trial court did not abuse its discretion in allowing Dr. Pizzolatto to testify about what Dr. Leggio told him concerning the female circumcision, Ostrowe's part in having it done, and Turner's lack of knowledge that this was being done to her.
Nemeth's Statements to Fain
Another issue raised by Ostrowe is whether the trial court erred in refusing to admit certain evidence tending to establish that even if Turner did not know about the female circumcision when it was done, she had found out about it as early as 1982, in *1220 which case her claim had prescribed long before she filed suit in 1989.[12] The controversial evidence is contained in the of records of Thomas C. Fain, Ph.D., a psychologist who began treating Turner in 1988 for the emotional problems she was experiencing after learning of the female and her ex-husband's role in it. Ostrowe's assignment of error alleges the trial court committed reversible error when it excluded portions of Fain's records that reflected his conversation with Turner's previous treating psychologist, Darlyne G. Nemeth, Ph.D.[13] Fain's records include his handwritten notes from a telephone conversation with Nemeth, who had provided marital counseling to Turner and Ostrowe in the early 1980's. Turner had Nemeth and Fain to communicate concerning her treatment. Fain's notes from that telephone conversation among other things, "Got to a point to alter her body parts to please him. Wrong with clitoris and had it cut out and she did it. She naively went along." Because Nemeth's treatment of the couple ended in 1982, if this information indeed came from Turner during that marital counseling, Turner obviously was aware 1988 that the procedure had been done. Fain testified at trial and his medical records were admitted,[14] but his handwritten notes from the Nemeth conversation were ruled inadmissible by the trial court on the grounds that the statements were hearsay within hearsay and no hearsay exception was applicable. The handwritten notes from Fain's records were accepted by the trial court as a proffer after Ostrowe objected to the ruling. Nemeth was not called to testify, although she was in court and available; her deposition was proffered by Turner to rebut Ostrowe's proffer of the Fain notes.
Ostrowe contends that Nemeth's statements to Fain were not hearsay, because those statements were not offered into evidence to prove the truth of the matter asserted. See LSA-C.E. art. 801. He argues that Nemeth's statements were offered, merely to prove that Turner became aware of the female circumcision at a particular time and not to prove that the procedure had actually been done. This argument is enticing, but flawed. If Fain's notes had been offered merely to prove that Nemeth made certain statements at a certain time, then this argument might *1221 have merit. However, Fain's notes were offered to prove that Turner made certain statements to Nemeth at a certain time. What is the proof that Turner made these statements at that time? Nemeth said Turner told her.[15] Under these circumstances, the notes are being offered to prove the truth of what Nemeth said, namely, that Turner told her certain things during marital counseling. Therefore, Nemeth's statements are being offered to prove the truth of the matter asserted and under that definition, are hearsay.
Ostrowe further urges that Nemeth's statements were not hearsay, but rather were authorized admissions, because the statements were offered against a party and were statements by a person authorized by that party to make a statement concerning the subject. See LSA-C.E. art. 801(D)(2)(c). Ostrowe argues that when Turner gave Nemeth a release to provide information to Fain, she thereby authorized any and all statements Nemeth might make, and therefore, those statements are not hearsay. However, official comment (d) to Article 801(D)(2)(c) indicates that this subsection is based on traditional agency principles and covers statements that are specifically "authorized" by the principal and thus are classified as "representative" or "vicarious" admissions. See State v. Schexnayder, 96-98 (La.App. 5th Cir. 11/26/96), 685 So.2d 357, 366, writ denied, 97-0067 (La.5/16/97), 693 So.2d 796, cert. denied sub nom. Schexnayder v. Louisiana, 522 U.S. 839, 118 S.Ct. 115, 139 L.Ed.2d 67 (1997), writ denied, 97-2251 (La.1/16/98), 706 So.2d 973 (statement that was not specifically authorized was not admissible); see also, e.g., Masters v. Courtesy Ford Co., Inc., 32,275 (La.App. 2nd Cir.10/29/99), 758 So.2d 171, 182, writ granted and judgment vacated on other grounds, 00-1330 (La.6/30/00), 765 So.2d 1055 (recorded statement made by defendant's former employee to employer's insurance adjuster was an authorized admission); Pacholik v. Gray, 187 So.2d 480, 483 (La.App. 3rd Cir.1966) (communications by party's deceased former attorney of his client's intentions with regard to a proposed sale were within the scope of attorney's authority in the matter, so qualified as a vicarious admission of the client through his attorney). A release to allow a health care provider to provide information about a patient does not make the health care provider the patient's agent. Therefore these statements do not qualify as authorized admissions within the intent of Article 801(D)(2)(c).
Ostrowe further argues that, even if this court agrees that Nemeth's statements to Fain constituted hearsay within hearsay, they should have been admitted under one of several exceptions. Louisiana Code of Evidence article 805 states:
Hearsay included within hearsay is not excluded under the hearsay rule if each part of the combined statements conforms with an exception to the hearsay rule provided by legislation.
The trial court examined a number of hearsay exceptions and found none was applicable, stating:
Is there an applicable exception to the hearsay rule, provided by legislation, that satisfies the requirement of Article 805? It is not Article 803(3), as Dr. Nemeth is the declarant and it is not her condition or future actions that are at issue. Similarly, it is not Article 803(4) *1222 as that provision deals with patient's statements made for purposes of medical treatment or medical diagnosis (and again it is not Dr. Nemeth's condition at issue). It is not Article 803(5), dealing with recorded recollection, as subprovision (a) in the comments makes it clear that the person serving as a witness on the stand must have first hand knowledge of the matter described in the memorandum. Of course, in this instance, Dr. Fain had no first hand knowledge and was simply quoting Dr. Nemeth.

* * *
Finally, there are certainly very interesting issues presented regarding the possible applicability of Article 804(B)(6). The first is that the declarant must be unavailable and, of course, Dr. Nemeth was present at the trial but not called. The defendant correctly makes the point that one who testifies to a lack of memory of the subject matter of his or her statement satisfies the "unavailability" requirement but Dr. Nemeth's deposition was not admitted until the plaintiff offered rebuttal, on a proffer (see the following paragraph). Accordingly, despite arguable trustworthiness, the prerequisites of that provision have not been satisfied.
The deposition of Dr. Nemeth was put in on a proffer, in rebuttal to her statements in the event they are found admissible, but her deposition makes it clear that she really has no helpful recollection of the events. Accordingly, one might argue that Article 613 may have allowed the statement to be admitted as a prior inconsistent statement, on the foundation of Dr. Nemeth having been given the opportunity to admit the statement and failed distinctly to do so. However, Dr. Nemeth did not testify and therefore, that exception is not applicable. Accordingly, after previewing the post-trial briefs submitted to the court on this issue, the required result is to sustain the hearsay objection and not admit that evidence. (Footnote omitted).
Ostrowe contends the trial court erred in its evaluation of Article 803(4), because the comments to that article state that the declarant need not be the patient for this paragraph to apply. However, those comments also clarify that if the declarant is not the patient, "there must be sufficient indications from the circumstances that the declarant possessed firsthand knowledge of that of which he spoke." Obviously, Nemeth had no firsthand knowledge concerning any surgical procedures performed on Turner at any time.
We note that the introductory comments to the hearsay section of the Louisiana Evidence Code state the following:
A statement may be categorized under this Code as "non-hearsay" or as failing within an exception to the hearsay rule and yet it may have been made under particular circumstances that indicate that it is grossly and patently unreliable. In such a case the trial judge should exclude the statement if its admission would unfairly prejudice the objecting party.
LSA-C.E. Chapter 8, Hearsay, Introductory Note. This caveat is worth keeping in mind in evaluating the trial court's evidentiary ruling in this case. There are serious reliability problems with the entire content of the Nemeth statements, as jotted down by Fain. According to her deposition, Nemeth was involved in many more sessions with Ostrowe than with Turner. Additionally, Nemeth stated she had no notes at all from Ostrowe's or Turner's sessions with which to refresh her memory when she spoke with Fain over six years *1223 after the marital counseling ended.[16] Therefore, the origin of the information is suspectNemeth could have learned about the surgery from Ostrowe as easily as from Turner. Moreover, when Fain's notes from the telephone conversation were shown to Nemeth at her deposition, she stated, "a lot of this is Dr. Fain's interpretation of what was said," reiterating several times, that "I don't speak this way," and "this is not how I would have stated something." The lack of session notes, the intervening time lapse, the fact that the crucial information could have come from either Turner or Ostrowe, and Fain's note-taking limitations make the Nemeth statements inherently unreliable.
For these reasons, we agree with the trial court's decision not to admit into evidence Fain's handwritten notes that purportedly reflect the content of his conversation with Nemeth concerning information she supposedly received from Turner while counseling her and Ostrowe over six years earlier. In evaluating the trial court's decision, we are guided by the abuse of discretion standard of review; we find no abuse of that discretion in this case.
Liability of Ostrowe
Ostrowe contends the trial court erred in finding him liable for conspiracy to commit a civil battery where there was insufficient evidence in the record to show that he was liable. Based on our review of the record evidence in this case, much of which has been summarized in the section dealing with the prima facie evidence of conspiracy, we conclude there is a reasonable factual basis in the record for the finding of the trial court, and the record further establishes that the finding is not manifestly erroneous.
Judicial Interest
Finally, Ostrowe claims he should not have to pay judicial interest from the date of judicial demand, because the case was delayed when the first trial before a jury ended in a mistrial due to a comment by Turner. He asks this court to suspend that interest for the time period between the mistrial and the entry of judgment after the second trial.
However, Ostrowe cites no authority for this proposition, nor has our research disclosed any. Rather, Article 1921 of the Louisiana Code of Civil Procedure states that the court shall award interest in the judgment as prayed for or as provided by law. According to Louisiana Revised Statute 13:4203, legal interest shall attach from date of judicial demand on all judgments sounding in damages ex delicto that may be rendered by any of the courts. The language of this statute is mandatory. General Ins. Co. of America v. Watts, 129 So.2d 511, 514 (La.App. 1st Cir.1961); Le Blanc v. New Amsterdam Cas. Co., 202 La. 857, 13 So.2d 245, 248 (1943). An award of legal interest in tort cases is not discretionary with the court, as the interest attaches automatically until the judgment is paid, whether prayed for in the petition or mentioned in the judgment. Dufrene v. Duncan, 93-0403 (La.App. 1st Cir.3/11/94), 634 So.2d 19, 22. We conclude that this assignment of error is without merit.
General Damages Award
Turner claims the trial court used an incorrect standard in awarding general *1224 damages, resulting in an award that is an abuse of discretion and does not fairly compensate her for her physical and mental injuries. In making the award, the trial court reviewed the statements made by various treating physicians and psychologists, finding "no consistent record of treatment at any point over all these years." The court also expressed concern "about the implications of the divorce and motives involved on the part of Ms. Turner in this proceeding," noting "numerous instances in this record of clear signs that the divorce and other family issues have played a major role in the development of this case." Finally, the court concluded:
The court is not insensitive to the fact that some might feel a much higher award is justifiable under the circumstances. However, it is time to conclude this matter and allow these parties to reconstruct their lives in a productive way without being burdened further with this litigation (for their children's sake if not their own). Accordingly, the damage award in this case is fixed at $35,000, plus judicial interest from date of judicial demand, until paid.
Based on these written reasons for judgment, we agree with Turner that the trial court used some inappropriate factors in determining the amount of general damages to award. The plaintiff's mixed motives in filing the suit and the family's estrangement as a result of this litigation are not factors to be considered when making an award of general damages to the plaintiff.
General damages involve mental or physical pain or suffering, inconvenience, loss of gratification or intellectual or physical enjoyment, or other losses of lifestyle which cannot be measured definitively in terms of money. Aycock v. Jenkins Tile Co., 96-2348, 96-2349 (La.App. 1st Cir.11/7/97), 703 So.2d 117, 123, writ denied, 97-3056 (La.2/13/98), 709 So.2d 753, reconsideration denied, 97-3056 (La.3/20/98), 715 So.2d 1198. The primary objective of general damages is to restore the injured party in as near a fashion as possible to the state he or she was in at the time immediately preceding injury. Thibodeaux v. USAA Cas. Ins. Co., 93-2238 (La.App. 1st Cir.11/10/94), 647 So.2d 351, 356. Factors to be considered in assessing quantum for pain and suffering are the severity and duration thereof. Anthony v. Hospital Service Dist. No. 1, 477 So.2d 1180, 1186 (La.App. 1st Cir.1985), writ denied, 480 So.2d 743 (La.1986).
Based on our review of the record, we conclude that the trial court's award of general damages in this case is abusively low. Turner was a healthy mother of three small children in her early 30's when this surgery was performed. She suffered excruciating pain for months after the surgery, most of which, according to the doctors who testified, could not be attributed to the posterior repair and therefore, must have resulted from the female circumcision. The medical testimony revealed that such initial pain was an inevitable result of this procedure, which involved the complete exposure of this nerve-filled organ. According to Turner, this pain was so intense that she could not wear any underwear; she bought and wore long skirts to preserve her modesty. Turner said that even after the incisions healed, she experienced severe vaginal pain, particularly with sexual activity. However, after being told by her husband and Dr. DiBenidetto that there was nothing physically wrong with her, she decided she would just have to bear the pain and go on with her life. Therefore, although she continued to experience pain with touch or pressure, even to the extent of being unable to wear jeans since the surgery, she did not seek further medical treatment. Eventually, the acute *1225 pain receded and was replaced by genital numbness. However, the female circumcision did not prevent Turner from having sexual intercourse and, in fact, she and Ostrowe eventually had a fourth child.
Turner was angry with Ostrowe concerning the surgery even before she knew it included a female circumcision; she said she felt fine before her husband insisted she consult with Dr. Leggio concerning surgery, but following the surgery, she had such terrible pain and it never completely resolved. She repressed this resentment in order to make her marriage work. When she learned about the female circumcision, she felt totally betrayed and experienced disbelief, dismay, shock, and outrage concerning Ostrowe's role in having this done. According to Radzikowski and Pizzolatto, Turner's reactions to this information were extreme and hysterical. She sought mental health counseling several months later to deal with her emotions.
According to the doctors who testified concerning female circumcision, Turner has suffered a permanent and irreversible injury to this organ of her body. The physical damage has affected, and will always continue to affect, her ability to enjoy sexual activity. In addition, she has endured mental pain, depression, rage, helplessness, and humiliation due to this violation of the core of her sexual being. Her relationship with two of her children has become strained, because they sided with their father in this controversy.
Having determined that the meager general damage award constituted an abuse of discretion by the court, we must assess an appropriate measure of damages, keeping in mind that we can only raise the award to the lowest point within the court's discretion. Although we can be guided at this point by prior awards, the unusual nature of this injury and its consequences makes it difficult to draw meaningful comparisons to other cases.
In Seagers v. Pailet, 95-52 (La.App. 5th Cir.5/10/95), 656 So.2d 700, due to an improperly performed caesarian section, a woman suffered five years of genital pain that prevented her from having sexual relations with her husband; she also had incontinence and other problems that were ultimately repaired after two additional surgical procedures. A jury award of $54,000 for past pain and suffering and $53,750 for past, present, and future mental anguish and emotional distress was increased by the appellate court to $75,000 for each of those categories, for a total award of $150,000. In Edenfield v. Vahid, 621 So.2d 1192 (La.App. 3rd Cir.), writ denied, 629 So.2d 1171 (La.1993), a woman who had an improper repair of an anal fistula developed pain, incontinence, and other problems that were substantially repaired by a second surgery just four months later. The appellate court overturned the trial court's judgment in favor of the surgeon and awarded the woman $150,000 in general damages. In Smith v. State, through Dep't of Health and Human Resources, 93-691 (La.App. 3rd Cir.2/2/94), 631 So.2d 628, $100,000 in general damages was awarded to a woman who experienced pain and other problems as a result of an improper repair of an episiotomy after giving birth. A second surgery nine months later repaired the problem with no residual physical impairments. A thirty-six-year-old man who suffered loss of normal sexual function following an accident was awarded $25,000 by the trial court; this court raised the award to $125,000, stating this was "the lowest level a reasonable trier of fact could have awarded." Finwall v. Union Oil Co. of California, 551 So.2d 673, 674 (La.App. 1st Cir.1989).
*1226 Based on these cases and our own evaluation of an appropriate measure of damages for what the trial court aptly called "this infamous procedure," we conclude that $125,000 is the lowest reasonable award of general damages for the irreversible physical and mental injuries suffered by Turner as a result of the female circumcision. The judgment of the trial court will be amended accordingly.

CONCLUSION
The judgment of the trial court is amended and Ostrowe is ordered to pay Turner $125,000, plus legal interest from date of judicial demand and all court costs other than those associated with the first trial. In all other respects, the judgment of the trial court is affirmed. All costs of this appeal are assessed against Ostrowe.
AMENDED AND AS AMENDED, AFFIRMED.
CARTER, C.J., concurs in the result.
NOTES
[2] Judge Ian W. Claiborne, retired from the Eighteenth Judicial District Court, is serving as judge pro tempore by special appointment of the Louisiana Supreme Court.
[3] This procedure was performed, ostensibly as a means of enhancing female sexual response, but according to documents and testimony in the record, it most often had the opposite result due to the exposure of the extremely sensitive nerve endings in the clitoris. Although for purposes of this opinion we will use the term female circumcision, physicians who testified in this case indicated the implied analogy to male circumcision is misleading; the more accurate analogy would be to the complete skinning of the penis, which, of course, is never done. The more recent medical literature includes female circumcision in a broad category called female genital mutilation.
[4] Various physicians testified concerning these terms. "D & C" refers to dilation of the cervix and curettage, or scraping, of the lining of the uterus in order to evaluate the health of the uterine tissue. A rectocele is a hernial protrusion of a portion of the rectum into the vagina. The perineum is located between the vagina and the anus; ulcerated tissue in this area is called a perineal ulcer. The surgical repair of the rectocele and perineal ulcer falls within the more general description of "posterior repair."
[5] See Turner v. Ostrowe, 96-1693 (La.App. 1st Cir.10/17/96) (unpublished writ action).
[6] However, court costs from the first trial that ended in a mistrial were imposed on Turner.
[7] According to Louisiana Code of Evidence article 801, hearsay is a statement, other than one made by the declarant while testifying at the present trial or hearing, offered in evidence to prove the truth of the matter asserted. Article 802 states that hearsay is not admissible except as otherwise provided by the Code of Evidence or other legislation.
[8] He is also the person who informed Turner in 1988 that, in addition to the posterior repair, a female circumcision had been done during that surgery.
[9] Turner also testified at the exception hearing and both trials that she did not consent to the D & C.
[10] The transcripts from the first trial and exception hearings were made part of the trial record in this case.
[11] Ostrowe argues that none of this evidence proves that he knew that Turner did not know. Such proof of a mental statewhat he did or did not knowcan only be by circumstantial evidence. The trial court evaluated the credibility of the witnesses and concluded that Turner was more credible than Ostrowe and that there was more support for her version of events. Such evaluations of the evidence are the prerogative of the trial court and are entitled to great deference by this court. The circumstantial evidence in this case is sufficient to establish that it is more likely than not that Ostrowe deliberately concealed what had been done, and therefore knew that Turner did not know about the female circumcision.
[12] According to Louisiana Civil Code article 3492, delictual actions are subject to a liberative prescription of one year. This prescription commences to run from the day injury or damage is sustained. However, under the ancient civilian doctrine of contra non valentem agere nulla currit praescriptio, it is well-settled that prescription does not run against one who is ignorant of the facts upon which his cause of action is based as long as such ignorance is not willful, negligent, or unreasonable. White v. West Carroll Hosp., Inc., 613 So.2d 150, 155 (La.1992); Hebert v. Doctors Memorial Hosp., 486 So.2d 717, 721 n. 7 (La.1986).
[13] Although Ostrowe characterizes Nemeth and Fain as "treating physicians," this is not entirely accurate; each has a Ph.D. in clinical psychology and is a practicing psychologist, but neither is a medical doctor.
[14] The trial court admitted the medical records under Louisiana Revised Statute 13:3714, as amended in 1999, which states, in pertinent part:

Whenever a ... record of any ... health care provider ..., certified or attested to by the ... health care provider, is offered in evidence in any court of competent jurisdiction, it shall be received in evidence by such court as prima facie proof of its contents, provided that the party against whom the... record is sought to be used may summon and examine those making the original of the ... record as witnesses under cross-examination.
Under Louisiana Revised Statute 40:1299.41(A)(1), the term "health care provider" includes psychologists.
[15] We make this categorical statement merely to illustrate the logical sequence concerning the matter being asserted. Actually, Nemeth's deposition indicated she was not certain that it was Turner who provided this information to her.
[16] Although Nemeth did not have notes from the counseling sessions, she did have a ledger showing when she had met with Turner, Ostrowe, or both of them together. According to that ledger, her last individual session with Turner was December 17, 1981; the last session with the couple was December 23, 1981; and the last individual session with Ostrowe was March 23, 1982. The conversation with Fain took place in October 1988.