GAIDRY, J.
|2In this case involving a dispute over a shipbuilding contract, the shipowner appeals a $393,527.00 judgment in favor of the shipbuilder. We affirm.
FACTS AND PROCEDURAL HISTORY
Odyssea Vessels, Inc. (“Odyssea”) solicited bids in the winter of .2005 for the construction of two ninety-four foot vessels. A & B Industries of Morgan City, *185 Inc. (“A & B”) issued a bid quotation in January 2006 of $3,752,000.00 per vessel, with the price to include all steel purchasing, fabrication, piping, electrical, painting, engines, generators, underwater gear, carpentry, fenders and general outfitting. The bid from A & B specifically excluded the towing winch, towing winch engine, and electronics from the per vessel price. Odyssea and A & B subsequently entered into two separate vessel construction contracts (one for Hull # 317 and one for Hull # 318) which provided that for the consideration of $3,752,000.00 per vessel, A & B would furnish all facilities, labor, material, supplies, and equipment (except items required by the plans to be furnished by Odyssea) and perform all work necessary to construct the vessels and deliver the completed vessels and their component parts and systems to Odyssea on or before January 4, 2007. Both contracts contained the following pertinent provisions:
3. TIME FOR COMPLETION OF WORK
The work of [A & B] shall be performed at [A & B’s] facilities in Amelia, Louisiana and shall be prosecuted with due diligence without delay or interruption except as may be caused by Acts of God, inclement weather, labor difficulties or disputes, usual holidays and weekends, fires, accidents, difficulty or delays in obtaining labor, supplies, equipment or machinery or other delays beyond the reasonable control of [A & B] and shall thereafter be completed in every detail and particular on or before the 4th day of 2007.
I sin the event of any such delay, the date of completion shall be extended a period equal to the time lost by reason of any said causes, provided [A & B] shall give prompt notice in writing to [Odyssea] of any such delay, stating the cause thereof.
It is agreed that [A & B] shall not be responsible for any delays in completion of the work of [A & B] associated with any work to be performed by [Odyssea] or any late delivery of any [Odyssea] furnished items. Furthermore, [A & B] will not be liable for any liquidated damages or penalties for failure to complete the work of [A & B] within the specified time.
4. CHANGES AND MODIFICATIONS
Subject to the requirements of other work then pending at the facilities of [A & B], the right is reserved by [Odyssea] to make any deductions from or additions to the said specifications on giving due notice in writing to [A & B]; the cost of any such changes to be agreed upon in advance by [A & B] and [Odys-sea] and added to or deducted from the Contract Price. If any such change shall delay the completion of the work of [A & B], [A & B] shall be allowed additional time sufficient to cover such delay. A statement of the increased or reduced cost, or any additional time required, as aforesaid, shall be submitted to [Odys-sea] by [A & B] and shall be approved by [Odyssea] in writing before any such change is made.
An attachment to contract, signed by representatives of both A & B and Odys-sea provides:
It shall be the understanding of both [A & B] and [Odyssea] that a complete drawing package, complete nest tape package, as well as all regulatory bodies drawing submittals and fees shall be considered owner furnished. [A & B] shall construct this vessel in accordance with the owner furnished drawings and specifications and shall be classed as an ABS Loadline vessel only.
On February 1, 2006, almost a month after the signing of the contracts, John *186 Arceneaux of A & B sent an email to Chuck Denning of Odyssea describing the delays which had already been encountered:
As we are all aware A & B and Odys-sea Vessels signed construction contracts on 1^4-06 for two 94' tugs. At that time we were all under the impression that Entech & Associates would be able to produce the necessary information needed to start the vessel framing construction almost immediately. However, to date 2-1-06 we still have not gotten the necessary information to start the construction process. We have all been | informed through Entech & Associates that they have incurred some engineering setbacks that were unexpected to them. With that being said A & B Industries would just like to formally notify Odyssea Vessels that we will try our best to recover the lost time but would just like to formally inform you of the delays that we are all experiencing.
Then, on April 6, 2006, three months after signing the contracts, Mr. Arceneaux of A & B sent a letter to Mr. Denning of Odyssea identifying additional delays which had occurred or which were anticipated:
We are all aware that Entech & Associates had some delays at the start of this project due to the vessel being enlarged from 90' to 94', as well as recently losing an employee that was in charge of this project. However, we are just in the beginning phases of construction, and we are concerned that we will incur these problems throughout. Another major problem is that in order to keep our production schedule for the two vessels, we have had to release the nc tapes to Metals USA, and they have already started cutting this material. This means that all of the problems we have incurred on the first boat, we will have the same [problems] with the second vessel construction. At this time it is unknown the manhour delay that A & B has incurred being that we have not fixed alt of the problems yet.
Next are the delays in receiving the remainder of the design package. Items still pending are all superstructure, piping, electrical, shafting, and underwater gear, etc. I have asked for this information on numerous occasions, and have been given a number of different dates. Still to date, we have not received any of this information. We need this information as soon as possible due to we have [to] find the price and order the necessary materials.
On May 2, 2006, Mr. Arceneaux wrote another letter to Mr. Denning requesting that Odyssea demand a set completion date from Entech & Associates, and stating:
Please understand that we have been significantly delayed with this project from the very start with not getting the required information on time; as well as the continuing engineering mistakes.... A & B Industries is in need of the remaining package for this project. With the industry growth that has taken place within the last couple of months, materials are getting very difficult to find, get a timely delivery; as well as the prices are increasing dramatically. [W]e cannot stress enough how much we need this information for one, to keep these vessels within budget, and two, to stay on some sort of timely delivery.
|5Another letter from A & B dated June 12, 2006 states that A & B was still waiting for drawings, and that this was a major delay which would ultimately delay the entire project. The letter further states that A & B has contacted Entech & Associates on numerous occasions due to the many problems that had arisen, and asks *187 Odyssea to contact Enteeh & Associates and “ask them to please do whatever it takes to expedite the process as quickly as possible.”
Another letter from A & B dated June 23, 2006 stated that on that date, approximately five and a half months since the contracts were signed, A & B still had not received the remainder of the drawings. The letter also stated that material costs had risen 85% to 40%, and that once A & B finally received all the approved drawings, they would need to meet with Odys-sea to discuss what additional costs would be incurred.
A July 10, 2006 letter from A & B stated that they still had not received the remaining drawings for the hull structure, piping systems, electrical systems, or underwater gear. A & B cautioned that they were in the process of closing up the hulls on the vessels, and once the hull was completely closed up it would be very difficult and costly to install all of the necessary piping. A & B stated that the delivery of the vessels would likely be drastically delayed due to the lack of information.
An August 16, 2006 email from Mr. Ar-ceneaux to Mr. Denning stated that they still had not received the remaining drawings, that the hull of vessel 317 was completely closed up, and that would make it very difficult for the workers to do the work inside the hull. Mr. Arceneaux reiterated that the continual delays created by Enteeh & Associates were disrupting the time frame for construction and again asked for Odyssea’s help in getting Enteeh & Associates to expedite their work so that the project was not further 16delayed. In a second email on that same date, Mr. Ar-ceneaux advised Mr. Denning that Enteeh & Associates had informed A & B that the hull, underwater gear, and some piping drawings had been approved by the ABS, but Enteeh & Associates did not provide the drawings to A & B, and Mr. Arceneaux requested Mr. Denning to contact Enteeh & Associates to obtain the drawings for A & B since Odyssea, not A & B, is Enteeh & Associates’ customer.
Two change orders, numbered 317-01 and 318-01, were prepared by A & B on November 6, 2006 and approved by Odys-sea on November 9, 2006. These change orders stated:
A & B Industries to provide labor, material, and equipment to modify existing quarter bitts. Currently the bitts are constructed as per the provided drawings. Bitts shall be modified as per the design of owner’s representative.
The estimated cost of change orders 317-01 and 318-01 was $7,894.00 each. The change orders noted that no additional time would be added to the schedule based upon the change orders. The change orders were signed by representatives of A & B and Odyssea.
A December 19, 2006 email from Mr. Arceneaux informed Mr. Denning of difficulty in getting an invoice paid as agreed and of more delays in construction due to missing or inadequate drawings and modifications that needed to be made to the vessels. For example, the main engines would not fit through the designed cutouts, so the engines would have to be disassembled and reassembled and “major steps” would have to be taken in cutting the completed main deck cabin to get to the engine room. Mr. Denning replied to this email on December 28, 2006 with “Let’s (sic) discuss after the holidays.”
|7On February 16, 2007, Mr. Arceneaux advised Mr. Denning of his concerns that he had still not received any ABS approved drawings, and that ABS inspectors had informed him that they also had no drawings with which to perform the required inspections. Mr. Arceneaux again *188 asked for Odyssea’s assistance in getting the ABS approved drawings from Entech & Associates.
On April 28, 2007, Mr. Arceneaux emailed Marc Molaison of Entech & Associates asking for certain drawings and informing him that those drawings were holding up progress and needed to be addressed.
Change orders 317-02 and 318-02 were prepared by A & B on May 14, 2007. These change orders stated:
A & B Industries is to provide labor, material, and equipment to modify existing stairway leading from the fiddly to the engine room. Currently the stairway is constructed as per the provided drawings. The stairway shall be modified in a way to accommodate the relocation of the winch engine from the engine room space to the fiddly area.
The estimated cost of change orders 317-02 and 318-02 was $9,163.50 each, and the change orders stated that no additional time would be added to the schedule. Although the box signifying approval was checked on both change orders and a representative of Odyssea signed both change orders, there is no date next to the approval on either change order, the signature line for A & B’s representative is blank on both change orders, and the change orders are both marked “NOT PAID.”
Change orders 317-03 and 318-03 were prepared by A & B on May 23, 2007 and approved by Odyssea on May 29, 2007. These change orders stated:
A & B Industries is to provide labor, material, and equipment to return the originally ordered main propulsion shafts and replace with the corrected length of shafts. Also to Rmodify the originally designed tiller arms in order to fit the required steering system.
The estimated cost of change orders 317-OS and 318-03 was $17,969.00 each, and no additional time was added to the schedule based upon those change orders.
On May 25, 2007, Mr. Arceneaux emailed Mr. Denning informing him that he had still not received information requested months before from Entech & Associates. Mr. Arceneaux stated that vessel Hull 318 would be launched no later than June 1, 2007, and if the requested information was not received prior to launch, Odyssea would be responsible for dry-docking the vessel at a later date for completion of that portion of the work.
On June 12, 2007, Mr. Arceneaux again emailed Odyssea asking for help in obtaining delayed drawings from Entech & Associates because the drawings were holding up the machine shop’s work.
On July 5, 2007, apparently in response to complaints from Odyssea regarding the progress of the vessels and a statement by Mr. Denning that Odyssea would have the vessels towed to another yard to be completed, Mr. Arceneaux sent a letter to Mr. Denning outlining the many delays A & B had experienced and stated:
A & B Industries has had to endure a great deal of over cost due to the extended time frame in which it has taken to get to the point of construction we are at now. [A]lmost all associated equipment and materials for these projects have increased in price dramatically.... A & B has multiple other projects under construction at the same time.... [and] some of our vendors as well as our own employees have had to move on to other projects [that do not have these types of delays or problems] due to the delays that have been incurred on these vessels .... [T]he electrical may have to be subcontracted to an outside vendor due to our electrical staff has had to move on to other projects to begin and *189 complete these vessels. This is also a fact for the carpenter crew. This particular vendor can not start the necessary process of interior joiner work until the interior electrical is at least roughed in. This vendor has also had to move on to other projects due to the same delays.
laA & B Industries does not see these vessels being completed in any sort of timely manner due to the delays that have been incurred to date as well as the amount of cost overrun that A & B Industries has had to endure.
The July 5, 2007 letter presented two options to Odyssea: (1) Purchase the remaining balance of the contracts from A & B and remove the vessels to be completed by another vendor; or (2) Re-negotiate the contracts for the vessels to compensate A & B for all delays and costs endured. A meeting was held on July 16, 2007 between A & B and Odyssea to discuss the options presented to Odyssea in the July 5, 2007 letter, and afterwards, Mr. Arceneaux sent a letter to Odyssea containing a proposal for an additional compensation agreement for A & B to complete the vessels.
A surveyor hired by Odyssea inspected the boats on July 31, 2007 and found that the workmanship was in good order and to ABS standards, but speculated that Hull 317 was only 45% to 50% complete and that Hull 318 was only 50% to 55% complete. The surveyor estimated that the vessels would take approximately six months each to be completed at a cost of approximately $1.15 million per vessel.
On September 24, 2007, Odyssea filed suit against A & B, alleging that A & B had breached the contracts by failing to deliver the vessels by January 4, 2007; failing to work with due diligence and without delay or interruption; failing to perform work for which it had been paid; failing to adhere to clause 4 of the contracts regarding changes and modifications; and failing to properly construct the vessels. At the time the suit was filed, Odyssea claimed that it had already paid to A & B $3,564,400.00 per vessel, plus another $71,000.00 for change orders submitted by A & B and approved by Odys-sea, but despite those payments A & B had ceased work on the vessels. Odyssea also alleged that an inspection revealed that the vessels had some lindeficiencies due to A & B’s or its subcontractors’ negligence. Odyssea claimed that it sustained damages as a result of A & B’s breach in the form of increased costs to complete the vessels, loss of profits from the vessels, attorney fees, and costs., Odyssea also requested the issuance of a writ of sequestration directing the sheriff to seize Odys-sea’s property in A & B’s possession.[1] A & B filed a reconventional demand claiming that Odyssea breached the contracts and is liable to A & B for damages arising from the breach. Specifically, A <& B alleges that Odyssey breached the contract by failing to timely provide things it was responsible for furnishing under the contract, resulting in delays, and by terminating the contract based upon the delays which it caused. A & B also asserted a privilege and lien on the vessels.
After a trial, the jury found that Odys-sea, not A & B, breached the contract, and that Odyssea’s breach caused a loss in the amount of $393,527.00 to A & B. Odyssea has appealed the trial court judgment and assigns the following trial court errors on appeal:
1. The court erred in awarding damages for increased costs when the required change orders were not issued.
*190 2. The court erred in awarding damages for delay because the contract provides that the exclusive remedy for delays is an extension of the completion date.
3. The court erred in failing to find that A & B breached the contracts by refusing to complete the contracts without additional payments.
4. The court erred in excluding testimony and limiting cross-examination of witnesses.
|n5. The jury erred in finding that A & B’s delay in completing the work was excusable and not a breach of A & B’s obligations under the contracts.
DISCUSSION
Legal agreements have the effect of law upon the parties, and, as they bind themselves, they shall be held to a full performance of the obligations flowing therefrom. Spohrer v. Spohrer, 610 So.2d 849, 851-52 (La.App. 1st Cir.1992). When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties’ intent. Spohrer v. Spohrer, 610 So.2d at 852. The rules of interpretation establish that when a clause in a contract is clear and unambiguous, the letter of the clause should not be disregarded under the pretext of pursuing its spirit. Spohrer v. Spohrer, 610 So.2d at 852. Louisiana Civil Code article 2045 defines interpretation of a contract as “the determination of the common intent of the parties.” Lindsey v. Poole, 579 So.2d 1145, 1147 (La.App. 2nd Cir.), writ denied, 588 So.2d 100 (La.1991). Such intent is to be determined in accordance with the plain, ordinary, and popular sense of the language used, and by construing the entirety of the document on a practical, reasonable, and fair basis. Lindsey v. Poole, 579 So.2d at 1147.
Odyssea’s first argument on appeal is that A & B could not be awarded increased costs under the contracts when they did not issue the change orders required by the contracts. The contractual provision calling for change orders is contained in the section entitled “CHANGES AND MODIFICATIONS,” and calls for the preparation of change orders by A & B in the event Odyssea makes deductions from or additions to the specs of the vessels in writing so that the parties can agree on the cost change and any | ^additional time required before the change is made. There is no requirement in the contract that A & B prepare a change order when Odyssea is delayed in delivering owner-furnished items to A & B, nor is there evidence that Odyssea sent a written request to A & B requesting a change in the specs of the vessels to provide for the late delivery of owner-furnished items, i.e., the complete drawing package, the complete nest tape package, as well as all regulatory bodies drawing submittals and fees, as is called for under the contract to prompt the creation of a change order.
Further, there is no requirement in the contract that A & B provide any sort of notice in order to secure an extension of time where the delay results from the untimely provision of owner-furnished items. The first paragraph under the section of the contract regarding time for completion of the work controls delays caused by Acts of God, inclement weather, labor difficulties or disputes, usual holidays and weekends, fires, accidents, difficulty or delays in obtaining labor, supplies, equipment or machinery or other delays beyond the reasonable control of A & B, and provides that A & B is entitled to an extension of the completion date equal to the period of time lost due to the delays, provided A & B gives prompt written notice to Odys- *191 sea of the cause of the delay. The second paragraph of this section controls delays in completion caused by any late delivery of any owner-furnished items. This paragraph provides that A & B is not responsible for these delays and shall not owe any damages for failure to complete the work within the specified time. This paragraph does not have a similar requirement that A & B .give Odyssea notice of the cause of the delay in writing, presumably because the cause of the delay is under Odyssea’s control and therefore known by Odyssea. Thus we do not find that any change orders were required under 113the clear terms of the contract for Odyssea’s delays in delivering owner-furnished items. This assignment of error lacks merit.
Odyssea next argues that the court erred in awarding damages to A & B for Odyssea’s breach of the contract because the exclusive remedy provided by the contract for Odyssea’s failure to timely deliver owner-furnished items was an extension of time for A & B to complete the work. In fact, what the contract states is that A & B will not be responsible for delays caused by Odyssea and will not be liable for any liquidated damages or penalties for failure to complete the work on schedule. A & B argues that merely providing an extension of time when Odyssea dragged the project on indefinitely by failing to timely furnish necessary materials would not fully compensate A & B for lost time and increased labor and material costs. If the parties intended to limit Odyssea’s liability for causing delays to simply an extension of time, they could certainly have done so. They did not. Louisiana Civil Code article 1994 provides that an obligor is liable for damages caused by his failure to perform which results from nonperformance, defective performance, or delay in performance. Damages for failure to perform are measured by the loss sustained by the obligee and the profit of which he has been deprived. Since the contracts contain no expression of the parties’ intent to limit Odyssea’s liability for failure to perform, we find no error in the court’s award of damages as provided by the Civil Code for Odyssea’s failure.
Odyssea next argues that the court erred in failing to find that A & B breached the contracts when it refused to complete the lump sum contracts without additional payments. Odyssea argues that since A & B bid and contracted to build the vessels for a lump sum, it was a breach of those contracts to refuse to complete the vessels for the agreed-upon lump sum 114price. We disagree. As the jury concluded and we agree, Odyssea breached the contracts when it failed to timely provide the owner-furnished items under the terms of the contract; afterwards, when Odyssea threatened to take the vessels elsewhere to be completed because they were not finished by the completion date in the contracts, A & B did not breach the contracts when it sought to modify the parties’ agreements so that the vessels could be completed at A & B’s shipyard. The evidence supports A & B’s assertion that this proposal by A & B was an attempt to resolve the parties’ differences, rather than an attempt to extract more money from the shipowner. Thus, we find no error in the jury’s finding that A & B did not breach the contracts.
Odyssea’s next argument is that the court erred in excluding the testimony of Odyssea’s witness, David McRae. Mr. McRae was the general manager of a company, C & E, that had contracted with A & B for the construction of a vessel for a lump sum price during the same time period A & B was constructing the vessels for Odyssea. Odyssea alleges that Mr. McRae would have testified that A & B *192 had all of the necessary drawings at the commencement of the contract to build C & E’s vessel, and that only a few change orders were issued, but that A & B still requested an increase in the lump sum price to complete the vessel and also delivered the vessel after the agreed-upon completion date. Odyssea alleges that Mr. McRae would have testified that it was his opinion that A & B’s delays with C & E’s vessel were due to A & B’s insufficient manpower and inability to complete all of the jobs undertaken at the time. Mr. McRae also would have testified to his belief that the real reason A & B was not working on C & E’s vessel was that they had underbid the contract and were losing money. A & B filed a motion in limine to exclude Mr. McRae’s testimony on the grounds that any delays or extra charges in the construction of C & E’s vessel were not relevant to | TSOdyssea’s claims against A & B. In considering the motion, the trial court asked whether “the only thing he’s going to talk about is the delay on [C & E’s] project and the nature of [C & E’s] project,” and Odyssea’s attorney answered yes. The trial court then granted the motion and excluded Mr. McRae’s testimony.
Generally, the trial court is granted broad discretion on its evidentiary rulings, and its determinations will not be disturbed on appeal absent a clear abuse of that discretion. Turner v. Ostrowe, 01-1935, p. 5 (La.App. 1 Cir. 9/27/02), 828 So.2d 1212, 1216, writ denied, 02-2940 (La.2/7/03), 836 So.2d 107. Except as otherwise provided by law, all relevant evidence is admissible. LSA-C.E. art. 402. Relevant evidence is evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence. LSA-C.E. art. 401. Whether evidence is relevant is within the discretion of the trial court, and its ruling will not be disturbed on appeal in the absence of a clear abuse of discretion. Boudreaux v. Mid-Continent Cas. Co., 05-2453, p. 8 (La.App. 1 Cir. 11/3/06), 950 So.2d 839, 845, writ denied, 06-2775 (La.1/26/07), 948 So.2d 171.
Odyssea claims that Mr. McRae’s testimony about what happened with C & E’s vessel was relevant to prove that the true reason A & B was delayed in constructing the vessels for Odyssea was not the untimely delivery of the plans, but rather that Odyssea was understaffed and stopped working on the vessels because they were not producing enough profit. We find no abuse of discretion in the trial court’s decision to exclude this testimony as irrelevant.
Odyssea next argues that the court erred in limiting its cross-examination of Mr. Arceneaux about the reasons for the delays on C & E’s |lfiproject. The court allowed Odyssea’s attorney to question Mr. Arceneaux about whether the C & E vessel was delivered-on time or if it was substantially late; after Mr. Arceneaux testified that the C & E vessel was delivered substantially late, the court did not allow Odyssea to question him any further about the reasons for the delays on the C & E vessel. Odyssea argues on appeal that the evidence it sought to elicit on cross-examination was relevant for the same reasons Mr. McRae’s testimony was relevant. Just as with Mr. McRae’s testimony, we find no abuse of discretion in the trial court’s determination that this evidence concerning C & E’s vessel was not relevant to the claims between Odyssea and A & B. These assignments of error are without merit.
CONCLUSION
For the reasons set forth hereinabove, the judgment in favor of A & B and *193 against Odyssea is affirmed. Costs of this appeal are assessed to plaintiff, Odyssea Vessels, Inc.
AFFIRMED.

. A writ of sequestration was issued, and the vessels were returned to Odyssea.