844 So.2d 926 (2003)
Threntha Lynn RATLIFF, Individually, and as Tutrix of the Estate of Sonya Ratliff, Minor and Clorenda Ratliff, Minor, and Allen Ratliff, Darlene Ratliff Owens
v.
STATE of Louisiana, Through the DEPARTMENT OF TRANSPORTATION AND DEVELOPMENT.
No. 2002 CA 0733.
Court of Appeal of Louisiana, First Circuit.
March 28, 2003.
Rehearing Denied May 30, 2003.
*928 Michael J. Paduda, Jr., Bogalusa, Counsel for Plaintiffs/Appellees Threntha Lynn Ratliff, Individually and as Tutrix of the Estate of Sonya Ratliff, Minor, Clorenda Ratliff, Minor, and Allen Ratliff and Darlene Ratliff Owens.
Craig J. Robichaux, Mandeville, Counsel for Defendant/Appellant State of Louisiana, Department of Transportation and Development.
Before: FOIL, McCLENDON, and KLINE,[1] JJ.
McCLENDON, Judge.
This appeal arises from a wrongful death and survival action award against the State of Louisiana for an automobile accident that occurred on the Pearl River Bridge, spanning the Pearl River between Louisiana and Mississippi. For the reasons that follow, we affirm.

FACTS AND PROCEDURAL HISTORY
On April 19, 1986, plaintiffs' mother, Bertha Ratliff Peters, while a passenger in a vehicle driven by Thomas Davis, was mortally injured when their vehicle left their lane of travel and collided with a vehicle driven by D.L. Kennedy, which was traveling in its proper lane of travel and approaching from the opposite direction.
*929 This accident occurred on the eastbound side of the Pearl River Bridge, as the Davis vehicle passed into Mississippi from Bogalusa, Louisiana.
Plaintiffs' wrongful death and survival action was filed on June 30, 1986 against the State of Louisiana through the Department of Transportation and Development (DOTD), alleging the negligence of the state in the design, construction, maintenance, and/or the failure to warn motorists of same. DOTD answered the suit, denying liability and alleging negligence on the part of the other parties to the accident. Plaintiffs' petition was later amended to change the status of plaintiffs who had previously been minors and had subsequently attained the age of majority
Following a trial in the matter, DOTD was found to be one hundred percent liable for the accident, and damages were awarded to plaintiffs in the amount of $557,500.00. DOTD appealed this judgment and on appeal makes the following assignment of errors:
A. The district court erred in admitting into evidence the bridge inspection reports in contravention of 23 USCA 409. As a result of this error, there is no deference given by this court to the findings of fact made by the district court.
B. The district court erred in finding that DOTD had the garde and/or maintenance responsibility for the section of the Pearl River Bridge at issue.
C. The district court erred in failing to follow the Supreme Court's analytical framework as espoused in[Reichert v. State Department of Transportation and Development, 96-1419 (La.5/20/97), 694 So.2d 193] and in particular the continued necessity to determine as a matter of fact/law whether a particular commission or omission is a cause in fact of the harm, which otherwise would fall within the duty owed by the defendant to the plaintiff.
D. The district court erred in failing to apply the longstanding jurisprudential rule that the driver of a vehicle who collides with another vehicle in its proper lane is presumed solely at fault, unless the offending driver can exculpate himself by clear and convincing evidence from even the slightest fault.
E. The district court erred in failing to apportion fault to Mr. Davis who collided with another vehicle in its proper lane.
F. In the alternative, the district court committed manifest error in making certain findings of fact.
G. The district court erred in failing to recognize the separation of powers and/or discretionary function immunity accorded DOTD.
H. The district court erred in awarding damages, including the award of certain elements of damage and/or erred in the amount awarded based upon the lack of evidence in this case.

DISCUSSION AND ANALYSIS
A court of appeal may not set aside a trial court's or a jury's finding of fact in the absence of "manifest error" or unless it is "clearly wrong." Evans v. Lungrin, 97-0541, p. 6 (La.2/16/98), 708 So.2d 731, 735; Stobart v. State, Department of Transportation and Development, 617 So.2d 880, 882 (La.1993), citing Rosell v. ESCO, 549 So.2d 840, 844 (La.1989). However, where one or more trial court legal errors interdict the fact-finding process, the manifest error standard is no longer applicable, and, if the record is *930 otherwise complete, the appellate court should make its own independent de novo review of the record and determine a preponderance of the evidence. Evans v. Lungrin, 97-0541 at pp. 6-7, 708 So.2d at 735, citingFerrell v. Fireman's Fund Insurance Company, 94-1252, p. 7 (La.2/20/95), 650 So.2d 742, 747.
In his reasons for judgment, the trial judge very succinctly summarized the voluminous and detailed trial testimony and evidence as follows:
On April 19, 1986, Bertha Peters was a guest passenger in a Chevrolet Chevette being driven by Thomas Davis. The Chevette was traveling east on Louisiana Highway 10 going from Bogalusa to Mississippi. Davis encountered a light rain as he approached the Pearl River Bridge. Davis recalls seeing another car coming toward him as he entered the grid section of the bridge. [FN 1. The grid was also referred to as a "grate" at times during the trial by the various witnesses and the attorneys.] He estimated his speed at that time to be approximately 40 miles per hour and recalled slowing down on the grid because the bridge was narrow. Davis testified that when his vehicle entered the grid surface of the bridge his car started to slide into the other lane of traffic. He tried to steer the vehicle back to the right but testified he had lost control and hit a vehicle being operated by D.L. Kennedy. Davis could not remember if his vehicle hit the curb of the bridge or if he used his brakes prior to impact.
Cherayl [sic] Johnson was traveling from Mississippi to Louisiana on the bridge with her husband and two daughters when the accident occurred. She testified that as she entered the grid of the bridge, she observed another vehicle, driven by Davis, coming toward her. The Davis vehicle slid over into her lane of traffic facing her head-on. In response, she slowed her vehicle, and the Davis vehicle slid back into the other lane. After Davis narrowly missed her, she looked in her rearview mirror and saw him slide back into her lane, striking the Kennedy vehicle.
Johnson observed that before Davis' vehicle entered the grid, Davis was "driving fine" "still in his lane of traffic" just "like a normal car coming up the bridge." She testified that he was not slipping or sliding on the cement portion of the bridge, prior to entering the grid surface. However once on the grid, the Davis vehicle began to slide out of control as if he were on a "piece of glass". Johnson estimated that her speed was approximately 20 to 25 miles per hour with Davis' speed at 30 to 35 miles per hour before the accident. She noted that at least three-fourths of Davis' vehicle moved into her lane, and that he slid sideways when he moved back into his lane.
Following the collision, Johnson was able to stop her vehicle on the grid surface. As she exited her vehicle, she slid on the grid herself. She and her daughter went to the Davis vehicle to offer assistance where they observed that Ms. Peters, after trying to speak, passed away.
D.L. Kennedy was traveling west on the bridge behind the Johnson vehicle in a 1979 Oldsmobile with his wife Vera. He testified he saw Davis lose control when Davis was approximately 20 to 25 feet onto the steel grid. He then observed Davis pass the Johnson vehicle, and it appeared that the Davis vehicle hit the curb in Davis' lane, however Kennedy did not actually see Davis hit the curb. Kennedy further recalled that Davis suddenly came back into his lane *931 colliding with his vehicle which resulted in it being knocked back eight to ten feet. The collision occurred in Kennedy's lane of traffic approximately thirty feet before his vehicle would have reached the steel grid.
Y.B. "Bull" Varnado owned a camp which was located approximately seventy-five feet from the Pearl River [B]ridge. He was at his camp at the time of the accident and heard the collision of the vehicles. He went immediately to the bridge to offer assistance. In his testimony, Varnardo described the grid as "slick". He also noted that the accident occurred approximately thirty feet from the grid and expressed it appeared that Davis had lost control of his vehicle. Varnado also testified that he knew of many vehicles over the years which had lost control on the grid and would either spin around or hit the railing. This occurred frequently in rainy weather. Further, many of the accidents on the bridge were never reported.
The Pearl River [B]ridge was constructed in 1953. [FN2. The Pearl River [B]ridge was torn down and replaced in 1997.] In connection with this construction, the State of Louisiana and the State of Mississippi entered into an agreement whereby each state would pay for fifty percent of the construction for the 240 foot swing span. The agreement also called for each state to maintain and repair its approach structure up to the rest piers. Mississippi would maintain and repair the swing span, however, if the costs of repair to the swing span exceeded $1,500.00, then the two states would conduct a joint inspection. Louisiana would then reimburse Mississippi for fifty percent of the costs associated with the repair of the swing span.
Frank Legoria, a bridge inspector for the State of Louisiana at the time of the accident, prepared an inspection report of the bridge on July 17, 1984, noting particularly that the grid was worn considerably due to excessive traffic. He expressed in his report the grid was 100 percent worn in some areas and 75 percent worn in other areas. Legoria observed that the grid needed replacing as sections were broken apart. He also took some photographs which were attached to his report and sent to DOTD in Baton Rouge [on July 24, 1984]. Legoria testified that some of the grooves were worn and had become slick. He noted that he did not see the bridge when it was originally constructed but stated that assuming it had grooves, they were no longer there, which he considered to be defective. From 1982 to 1992, Legoria regularly inspected the entire bridge and could not recall any maintenance ever being performed on the grid.
Gill Gautreau, a bridge maintenance engineer with DOTD, testified that before 1991 there were no joint inspections performed between Mississippi and Louisiana. He expressed that prior to 1991, if Louisiana detected something significant upon inspection, it would inform the other state. Gautreau explained that because of the state's lack of manpower, it was impossible for the state to read through every report, so instead it relied on a rating system.
The plaintiffs offered Andrew McPhate as an expert in mechanical engineering, vehicle dynamics, and accident reconstruction. He examined the grid section of the Pearl River [B]ridge in 1992 and found it was essentially "worn out" and therefore unreasonably dangerous to the motoring public. He noted there was an absence of "teats" on the grid and observed that the metal *932 had worn away thereby lacking the sharp comers which are necessary to latch onto tires for traction. McPhate observed that steel grids were designed to last for twenty to twenty-five years, however, the grid on the Pearl River [B]ridge was thirty-three years old at the time of the accident. He testified that when a steel grid gets wet, it has less traction and less friction. Additionally, a light rain will interact with the dirt and oil on the surface to make the grid slippery.
McPhate observed that since a Chevette has very small, narrow tires, it has fewer longitudinal features making it easier for the vehicle to slide from side to side. He estimated the co-efficient of friction on the bridge in the wheel paths to be .3 (which he considered defective) and from side to side to be less than .3. McPhate opined that if a driver took steering action after encountering the grid, he would have less lateral resistance.
McPhate expressed that the steel grid surface, as it existed in 1986, was unreasonably dangerous to the motoring public when it was wet, causing the Davis vehicle to lose control and not be able to recover, therefore resulting in the accident. Based on his study of the bridge and the depositions of the various witnesses, he believed the accident occurred when Davis entered the grid, at which time he may have made a steering move away from the guard rail. When he did, because of the slick grid, he lost control and started to slide into Johnson's lane, then back into his lane, and finally into Kennedy's lane. He opined that it was possible for the Davis vehicle to move the distance of 270 feet, accommodating one and one-half lane changes, at 45 miles per hour, with approximately a .2 lateral friction co-efficient.
James Clary, Sr., an expert in civil engineering with expertise in bridge design, safety, signing, and maintenance, inspected and measured the Pearl River [B]ridge. He opined that to replace the steel grid would have cost approximately $50 per square foot or a total of $288,000.00 (Louisiana's portion would have been $144,000.00). Clary also expressed that a steel grid which is worn down is extremely dangerous and slippery, especially in the misting rain, which he believed was the condition of the grid at the time of the accident, He opined that the failure in maintenance, design, and signage caused the accident.
The defense produced Jack Humphries as an expert in traffic engineering, safety, signage, maintenance, design, and accident reconstruction. He reviewed the bridge plans; inspection reports; depositions of witnesses; accident reports; and photos and opined that the cornering friction on a grid surface in wet weather is greater than.3. Tests were performed on another bridge located in St. Tammany Parish known as the Highway 11[B]ridge. Humphries believed the results were transferable to the Pearl River [B]ridge because both bridges had worn grids. He expressed that since Davis' vehicle went left and then back to the right, this indicated there was cornering friction available. Humphries testified that based on his review of the evidence, there was no condition on the bridge which caused Davis to leave his lane of travel.
Larry Petersen, an expert in the field of frictional properties, performed tests on the Highway 11[B]ridge and testified the Highway 11 and Pearl River [B]ridges were similar. He opined that tire squirm on a grid surface is minimal and can not redirect a vehicle. According to Petersen's calculations, he found *933 it impossible for Davis to make the lane changes he allegedly made without having lost control of the vehicle on the concrete approach before the grid. He expressed that if a .3 coefficient of friction is used, it would take more than 270 feet to accomplish the lane changes Davis made. Petersen also opined that his research indicates that steel grids are not slippery and provide ample safety traction.

ADMISSIBILITY OF BRIDGE INSPECTION REPORTS
In appellant's first assignment of error, it is alleged that the trial court erred as a matter of law in admitting bridge inspection reports prepared by DOTD into evidence, allegedly in contravention of 23 USCA 409. Because the bridge was constructed with federal funds and the inspection of the facility is a matter of federal law, appellant argues the admissibility of the reports is violative of 23 USCA 409.[2]
Because we decide herein that the pre-trial stipulation of the parties rendered the reports in question admissible, we find it unnecessary to address appellant's argument under 23 USCA 409.[3]
It is clear from the record that the reports at issue were stipulated by the parties as admissible at trial, though DOTD apparently later changed its mind in this regard. On August 6, 2001, pre-trial stipulations were filed by the parties and signed by both the DOTD's and the plaintiffs' attorneys. These stipulations contained the following paragraph:
Exhibits(Stipulated upon)
a. Reports attached to Legoria and Fekete deposition[s]:
1. August 3, 1982
2. July 24, 1984
3. July 29, 1986
These reports are the bridge inspection reports that were later objected to by the state.
Although stipulations cannot affect the powers, duties, and prerogative of the court, generally a stipulation has the effect of a judicial admission that binds the parties and the court when it is not in derogation of the law. Bujol v. Entergy Services, Inc., XXXX-XXXX, p. 7 (La.App. 1 *934 Cir.8/14/02), 833 So.2d 947, 957. Pre-trial stipulations as to what evidence will be presented to the court have been enforced. See LeRay v. St. Paul Fire and Marine Insurance Co., 444 So.2d 1252, 1255 (La. App. 1 Cir.1983), writ dismissed, 452 So.2d 1174 (La.1984).
Thus, we find no legal error in the trial court's admission of the bridge inspection reports into evidence.[4]

LIABILITY OF DOTD
In its second and third assignments of error, DOTD maintains that the district court erred in finding that it had garde and/or maintenance responsibilities over the section of the bridge at issue; and, the district court failed to follow the guidelines established in Reichert v. State Department of Transportation and Development by failing to determine whether the acts or omissions of DOTD were a cause in fact of the harm that would otherwise fall within the duty owed by the defendant to the plaintiff.
The duties of DOTD are set forth in LSA-R.S. 48:193, which provides in pertinent part as follows:
A. The department is hereby directed to repair and to keep in operating condition at its sole cost and expense, all municipal roads or streets which form a continuation of one of said highways; however, the final decision as to the designation or location of the particular municipal road or streets to be placed in the state system shall be left entirely up to the department. At the request of the governing authority of a municipality, the work may be contracted out to such municipality, but all such maintenance costs shall be paid for by the state, provided that the state shall not be responsible for the maintenance of sewers, street lighting, gas and water mains, and other public utilities. All damages to the streets or highways occasioned by the laying of sewers, street lighting, and other public utilities shall be paid by the owner thereof. The department shall control the parking on any highway which is hereafter constructed, widened, or relocated at the sole expense of the state. The department shall control signal lights and traffic other than parking on highways in the state system established hereby.
B. All new construction or relocation of roads, overpasses, underpasses, bridges, tunnels, or other highway betterment of roads in the state system located in municipalities shall be a cooperative effort between the municipality and the department; however, nothing herein shall prohibit a municipality from making contributions necessary to improve said highways beyond the standards fixed by the department. Nothing herein shall preclude the department from requiring railroads and such other public utilities which use the same from contributing to the payment of overpasses and underpasses and other traffic control devices, which contribution shall be reasonable under the circumstances and conditions to be determined by negotiation or arbitration. Nothing in this Subsection shall in any way affect the provisions of R.S. 33:3701 or any other general or special law applicable to municipal streets and to the extension of state highways through municipalities. Nothing herein shall be construed as altering the existing law concerning the removal of public utilities.

*935 C. In order to create a more efficient system of state highways and to eliminate a duplication of effort and properly channel traffic through the said municipalities, each municipality of over five thousand in population in this state, according to the latest available census, shall develop and adopt a master street plan which shall be submitted for approval by the department which shall insure the proper location and integration of the state highway connections in the total city street plan, which shall be subject to revision as traffic conditions may require.
D. The department is fully authorized through its officers and officials to enter into all contracts and agreements with municipalities, parishes, road districts, or other public agencies of the state of Louisiana or of the United States, and all private individuals, partnerships, corporations, or other private legal entities necessary to carry out the provisions of R.S. 48:191 through 193.
E. All public roads, road projects, bridges, tunnels, or other highway betterment involving parish or municipal streets or roads made under the provisions of R.S. 48:191 through 193 or any other Act of the legislature in which state-allocated revenues are used in the construction thereof shall be constructed and maintained in accordance with engineering standards and procedures established by the department, and the department is fully authorized to withhold certification or approval to any such project or highway betterment unless it is constructed in accordance with the standards established by the department for the project. [Emphasis added.]
In the instant case, the DOTD contends it contracted away its obligation to conduct maintenance on the Pearl River Bridge by virtue of its contract with Mississippi that required Mississippi to maintain the bridge. Therefore, DOTD maintains the State of Louisiana has no liability for any failure of Mississippi to fulfill that obligation.
In Robinson v. State Department of Transportation and Development, 454 So.2d 257 (La.App. 1 Cir.1984), writ denied, 458 So.2d 122 (La.1984), this court rejected a similar argument of DOTD that it had contracted with a private company to perform maintenance of a roadway and that DOTD's liability was thereby shifted to the private company as well. Noting that the maintenance of state highways in a reasonably safe condition is paramount to the safety of the public, as a matter of public policy there must be an accountable entity to whom the public can look for adequate maintenance of the roadways as well as for redress in the event that a defective condition in the highway precipitates injury. The court concluded that this duty to maintain the public roads and highways has been statutorily imposed on DOTD by LSA-R.S. 48:21,[5] and held that DOTD could not absolve itself of this duty by contract with a private entity. Robinson v. State Department of Transportation and Development, 454 So.2d at 261-62.
In so holding, the Robinson v. State Department of Transportation and Development court relied on the decision of Robertson v. Handy, 354 So.2d 626 (La. App. 1 Cir.1977), writ denied, 356 So.2d 434 (La.1978). In Robertson v. Handy, this court held that although LSA-R.S. 48:192 and 48:261 authorized the state to *936 contract with a municipality to perform maintenance on state highways within its corporate limits, the statutes do not relieve the state of the fundamental responsibility that the maintenance work be properly performed. Robertson v. Handy, 354 So.2d at 631.
We find the rationale of Robinson v. State Department of Transportation and Development and Robertson v. Handy equally applicable to contracts by the State of Louisiana with other states for the maintenance of state roads and highways. The statute underlying these decisions, LSA-R.S. 48:193, specifically provides that, "The department is fully authorized through its officers and officials to enter into all contracts and agreements with municipalities, parishes, road districts, or other public agencies of the state of Louisiana or of the United States, and all private individuals, partnerships, corporations, or other private legal entities necessary to carry out the provisions of R.S. 48:191 through 193."
We find the phrase "or other public agencies ... of the United States" contemplates that Louisiana can enter into a contract for the maintenance of its highways with either a federal or a non-Louisiana state agency. However, if public policy considerations compel our courts to prohibit DOTD from transferring total responsibility and liability for state highways to either a private entity or a Louisiana political subdivision, these same considerations prohibit DOTD from transferring total responsibility and liability for state highways to another state.
Even were we not to so hold, we believe the trial court correctly cited Harris v. Pizza Hut of Louisiana, Inc., 455 So.2d 1364 (La.1984), for the proposition that a duty can be assumed that does not otherwise exist, which renders such an actor liable for any breach of the assumed duty. In the instant case, even were there no independent duty to ensure the Pearl River Bridge were properly maintained, we agree with the trial court that DOTD, by its actions, voluntarily assumed this duty.
In Harris v. Pizza Hut of Louisiana, Inc., Pizza Hut argued that it had no duty to protect its patrons from the criminal acts of third persons on its premises. Nevertheless, Pizza Hut hired off-duty police officers to provide security for the Pizza Hut premises. When the officer on duty on the evening in question was negligent in the performance of his duties, resulting in the shooting of several patrons by would-be robbers, the supreme court held that Pizza Hut assumed the duty to provide security for its customers and was liable for damages caused by the breach of this assumed duty. Harris v. Pizza Hut of Louisiana, Inc., 455 So.2d at 1371-72.
Likewise, even if DOTD had no independent duty to ensure the Louisiana section of the Pearl River Bridge were properly maintained, it assumed that responsibility by routinely sending bridge inspectors to ascertain the condition of the bridge.[6]
One of the bridge inspectors who prepared the reports at issue, Mr. Legoria, testified that he began inspecting the Pearl River Bridge around 1979, but later was instructed to discontinue the Louisiana inspections that had previously been conducted independent of Mississippi, and thereafter, beginning sometime between 1989 to 1991, all inspections were conducted *937 jointly with Mississippi inspectors. Mr. Legoria testified that they had previously been under the impression that it was Louisiana's responsibility to inspect the bridges, but he was later instructed that Mississippi had maintenance responsibility for the bridge.
It was the testimony of Mr. Legoria that prior to the accident in question, he observed that the grid was worn considerably due to excessive traffic (one hundred percent worn in some areas and seventy-five percent in other areas); he stated that the grid needed replacing. Mr. Legoria further testified that the grooves that had originally protruded from the surface of the grid were no longer present, having been worn away. Mr. Legoria additionally could not recall any maintenance ever having been performed on the grid. Mr. Legoria's 1984 bridge inspection report rated the bridge overall at "5-6," which is considered "poor" to "fair," and recorded his hand-written notations as to the degree of wear he found on the bridge and his opinion that the grid might have needed replacing at that time.
Mr. Fossier, a DOTD engineering manager, testified that if "something very significant" were reflected in a bridge inspection report, Mississippi would have been notified. However, Mr. Fossier was unaware of whether any information contained in the reports at issue had in fact been transmitted to Mississippi.[7] Mr. Fossier stated that in the reports at issue the bridge had been rated overall as "mostly fair to good;" however, the comments that were attached were somewhat inconsistent with the rating given. Mr. Fossier further stated that if he had received such a report, containing inconsistencies, he would have contacted the bridge inspector and requested a new report be submitted since the rating assigned did not match the comments. Mr. Fossier admitted that at the time the inconsistent report was submitted, it was not questioned in all probability, because there was a manpower shortage in the department. Mr. Fossier was unable to point to any documentation that the negative information contained in the reports was conveyed to Mississippi and Louisiana made no effort to correct the defect found until the bridge was torn down and replaced in 1997.
DOTD had a responsibility to ensure the Louisiana portion of the Pearl River Bridge was properly maintained. DOTD inspectors discovered, prior to the accident at issue herein, that the bridge grid was very seriously worn and needed replacing; however, no remedial action was taken for well over a decade nor was it asserted that DOTD ever requested that Mississippi take remedial action.[8] Thus, we find no merit in DOTD's argument that it had no duty to maintain the bridge in question.

FAILURE TO ASSESS FAULT OF THOMAS DAVIS
Appellant contends that it was not established at trial that any action or inaction on its part was a cause in fact of the accident. Appellant also contends that the trial court erred in failing to assess any fault to Mr. Davis, and that but for the negligence of Mr. Davis in failing to keep his car under control, the accident would *938 not have occurred. Appellant further maintains the trial court committed manifest error in its findings of fact.
The trial court resolved the issue of fault as follows:
[T]here was much testimony produced from the various experts on how this accident occurred. Defendant's expert, Mr. Peterson gave persuasive testimony that Davis could not have lost control of his vehicle on the grid surface based on his calculations but must have lost control on the approach portion of the bridge. However, this Court can not dismiss the testimony given by the witnesses who actually saw the accident and finds these witnesses to be the most helpful in reconstructing the events leading up to the accident. Ms. Johnson, in particular was very helpful and credible, as she was the first person to encounter Davis on the bridge and was not involved in the subsequent impact.... [S]he testified that Davis had control of his vehicle prior to driving on the grid but once his vehicle was on the grid, he lost control and started sliding. Kennedy and Davis also testified that Davis had his vehicle under control before he arrived at the grid surface. Both Johnson and Bull Varnardo expressed that the grid was slippery at the time of the accident, Johnson actually slipping on the grid herself. Therefore, the Court concludes that Davis had control of his vehicle before he reached the grid surface and lost control of his vehicle once he reached the grid surface.
The physical evidence of the actual grid piece itself, the photographs of the grid, as well as the testimony of McPhate, Clary, and Legoria, support that the grooves or teats were worn down. Both McPhate and Clary testified that the absence of these grooves/ teats caused the grid to become extremely slippery, especially in wet weathers. There was also testimony that the grid's life span had expired some eight to thirteen years before the accident. The defense experts testified that the condition of the grid did not cause Davis to lose control of his vehicle, and that the steel grids provided ample traction. The Court also notes that much of the defense experts' opinions were based on tests performed on the Highway 11 [B]ridge. The Court does not place much weight on these tests because the bridges involved were different, the tests were performed under different conditions, and the grid surface on the Highway 11 [B]ridge does not appear to have been as worn as the Pearl River [B]ridge.
Based on all the evidence presented on this issue, the Court concludes that the condition of the grid was unreasonably dangerous to the motoring public and as noted above, that this condition caused the Davis vehicle to lose control on the grid resulting in the accident.
Clearly, the trial judge determined that the condition of the bridge grid alone caused the accident and that Mr. Davis was not negligent. The trial court must also have concluded that any presumption that Mr. Davis was at fault, attributable to the fact that his vehicle was not in his designated lane of travel at the time of the accident, was overcome by testimony, which was found credible, that the defective condition of the bridge caused Mr. Davis's car to cross into oncoming traffic.
When there is conflicting testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed on appeal, unless the documents and objective evidence so contradict a witness's story, or is the story itself so inconsistent or implausible, that a reasonable person would not credit the *939 story. Rosell v. ESCO, 549 So.2d 840, 844-45 (La.1989). Hence, whereas in the Instant case, there are two contradictory versions of the events in question, we are unable to say the trier of fact erred in crediting that of one over the other. Thus, we are unable to say the trial judge committed manifest error in finding DOTD one hundred percent liable for the accident at issue.

SEPARATION OF POWERS
Appellant argues the trial court was without legal authority to determine DOTD should have replaced or remedied the defect in the bridge at issue. DOTD points to the complex procedural requirements imposed on it by which improvement projects are funded in arguing that the courts are without authority to impinge on this process and that the state has discretionary immunity in the assignment of priority to highway projects.
We find no merit in this argument. The district courts have jurisdiction to decide personal injury cases even where the state is a defendant. The district court was not asked to intervene in the decision-making authority of DOTD in its road improvement and/or maintenance functions. The bridge had already been replaced by the time the matter went to trial. The trial court simply ruled on the state's liability for the condition of the roadway at the time of the accident.

DAMAGES
The trial court awarded each of Ms. Peters' two minor children $125,000.00 for the wrongful death of their mother. The three children over the age of majority were awarded $100,000.00 each.[9] The court further found that Ms. Peters lived for a short while after the accident and awarded $7,500.00 for her pain and suffering immediately prior to her death, on plaintiffs' survival action. Appellant contends these awards were excessive.
In the assessment of damages in cases of offenses, quasi offenses, and quasi contracts, much discretion must be left to the judge or jury. LSA-C.C. art. 2324.1. In reviewing an award of general damages, the court of appeal must determine whether the trier of fact has abused its much discretion in making the award. Turner v. Ostrowe, XXXX-XXXX, p. 5 (La.App. 1 Cir. 9/27/02), 828 So.2d 1212, 1216, writ denied, 2002-2940 (La.2/7/03), 836 So.2d 107, citing Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1260 (La. 1993), cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994). It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award. Youn v. Maritime Overseas Corp., 623 So.2d at 1261; Turner v. Ostrowe, XXXX-XXXX at p. 5, 828 So.2d at 1216. Only after it is determined that there has been an abuse of discretion is a resort to prior awards appropriate, and then only to determine the highest or lowest point of an award within that discretion. Turner v. Ostrowe, XXXX-XXXX at p. 5, 828 So.2d at 1216-17, citing Coco v. Winston Industries, Inc., 341 So.2d 332, 335 (La.1976); Dennis v. The Finish Line, Inc., 99-1413, p. 20 (La.App. 1 Cir. 12/22/00), 781 So.2d 12, 30, writ denied, XXXX-XXXX (La.3/16/01), 787 So.2d 319.
After a thorough review of the evidence presented to the trial court, we are unable to say there was an abuse of discretion in the award of damages in this case.

*940 CONCLUSION
For the reasons assigned the judgment of the trial court is affirmed. Costs of this appeal in the amount of $2,710.00 are to be borne by appellant herein, State of Louisiana through the Department of Transportation and Development.
AFFIRMED.
NOTES
[1] Hon. William F. Kline Jr., retired, is serving as judge pro tempore by special appointment of the Louisiana Supreme Court.
[2] "Notwithstanding any other provision of law, reports, surveys, schedules, lists, or data compiled or collected for the purpose of identifying, evaluating, or planning the safety enhancement of potential accident sites, hazardous roadway conditions, or railway-highway crossings, pursuant to sections 130, 144, and 152 of this title or for the purpose of developing any highway safety construction improvement project which may be implemented utilizing Federal-aid highway funds shall not be subject to discovery or admitted into evidence in a Federal or State court proceeding or considered for other purposes in any action for damages arising from any occurrence at a location mentioned or addressed in such reports, surveys, schedules, lists, or data." 23 USCA 409.
[3] Nevertheless, were we required to rule on the 23 USCA 409 issue, we believe the bridge inspection reports at issue in the instant case fall within the class of raw data, facts, or reports excepted from exclusion by 23 USCA 409, as not having been collected or compiled expressly for the purposes specified in 23 USCA 409, and therefore were admissible in court. See Reichert v. State Department of Transportation and Development, 96-1419 (La.5/20/97), 694 So.2d 193; Wiedeman v. Dixie Electric Membership Corporation, 627 So.2d 170 (La.1993), cert. denied, 511 U.S. 1127, 114 S.Ct. 2134, 128 L.Ed.2d 864 (1994). Paul B. Fossier, Jr., then a DOTD bridge engineering manager, testified that when a bridge report is received in the Baton Rouge office, the information contained therein is summarized in the computer system and used to generate reports through the department, though he stated that some information is sent to the Federal government to qualify bridges for replacement funding.
[4] Moreover, had there been any error in the admission of these reports, it was rendered harmless by the fact that the testimony of the preparers of the relevant reports gave testimony at trial, which would have been available had the reports been excluded.
[5] "The functions of the department shall be to study, administer, construct, improve, maintain, repair, and regulate the use of public transportation systems and to perform such other functions with regard to public highways, roads, and other transportation related facilities as may be conferred on the department by applicable law." LSA-R.S. 48:21(A).
[6] DOTD has been found liable in other instances where it assumed a duty to maintain a roadway it was not otherwise responsible for. See Rick v. State Department of Transportation Development, 93-1776 (La.1/14/94), 630 So.2d 1271; Arnold v. Illinois Central Gulf Railroad, 501 So.2d 778 (La.App. 1 Cir.1986), writ denied, 503 So.2d 479 (La.1987).
[7] At the time of trial, Mr. Fossier apparently held the position in the Baton Rouge office responsible for receiving and reviewing bridge inspection reports, though he was not the person who received the reports at issue herein.
[8] James Clary, Sr., plaintiff's expert, opined that to replace the steel grid would have cost approximately $50 per square foot or a total of $288,000.00 and that Louisiana's portion would have been $144,000.00.
[9] The children ranged in age from fifteen to twenty-six at the time of their mother's death.